**MINNESOTA CENTER FOR ENVIRONMENTAL ADVOCACY, Appellant,**

v.

**CITY OF ST. PAUL PARK, Respondent,**

**R. Gordon Nesvig, et al., Respondents.**

No. A05–1029.

Court of Appeals of Minnesota.

April 4, 2006.

Janette K. Brimmer, James L. Erkel, Minnesota Center for Environmental Advocacy, St. Paul, MN, for appellant.

George C. Hoff, Amanda K. Morken, Hoff, Barry & Kuderer, P.A., Eden Prairie, MN, for respondent City of St. Paul Park.

Laurie J. Miller, Richard D. Snyder, Debra A. Schneider, Fredrickson & Byron, P.A., Minneapolis, MN, for respondents Nesvig, et al.

Mike Hatch, Attorney General, David P. Iverson, Assistant Attorney General, St. Paul, MN, for amicus curiae Minnesota Department of Natural Resources.

Considered and decided by LANSING, Presiding Judge; SHUMAKER, Judge; and HALBROOKS, Judge.

## OPINION

SHUMAKER, Judge.

Respondent City of St. Paul Park, serving as the responsible governmental unit for purposes of environmental review, adopted an alternative urban area-wide review (AUAR) assessing the environmental impact of a proposed development of respondent R. Gordon Nesvig's property. Appellant Minnesota Center for Environmental Advocacy (MCEA) filed a complaint contending that the final AUAR was inadequate. The district court granted respondents' motion for summary judgment. MCEA appeals, challenging the scope and adequacy of the assessment of the final AUAR. We affirm.

## FACTS

The material facts are not in dispute. This litigation centers on the environmental review of a proposed development of a 667–acre parcel of land owned by respondent R. Gordon Nesvig. The property sits along the east bank of the Mississippi River in Washington County and is located within Grey Cloud Island Township and the City of St. Paul Park. The majority of the property consists of agricultural fields, old fields, and pastures. But woods, bluffs, oak savanna, and limited prairie remnants also exist, and the property includes islands, backwaters, and open water on the Mississippi River. The cliffs along the bluffs are unusual in Minnesota. There are seeps and springs along the bluffs. A bald eagle nests on the property, and two other eagle nests are within a mile of the property. Two endangered and one threatened species of mussels, along with many native species of plants, animals, and birds, are found on the property.

Part of the property is located within the Mississippi River Critical Area Corridor, permanently established in 1979 by executive order of the governor and desig-

nated as a "rural open space district." Local government units are directed to protect the Critical Area's resources, prevent and mitigate irreversible damage, and enhance its public value. According to the executive order, rural open-space districts "shall be used and developed to preserve their open, scenic and natural characteristics and ecological and economic functions."

Part of the property is also located within the Mississippi National River and Recreation Area, a 72–mile corridor which is part of the National Park System. Throughout the development, the boundary of the Recreation Area is the same as the Critical Area. As part of the Recreation Area, National Park Service activities are carried out in the corridor with the cooperation of 25 local government units, including Grey Cloud Island Township and St. Paul Park, and several federal and state agencies.

In November 2002, Nesvig; developer D.R. Horton, Inc.; the township; and the city entered into an agreement to develop Nesvig's property. The project was anticipated to begin in 2004 and to "be phased over the next 10–12 years." In March 2003, the city and the township adopted resolutions providing for environmental review through an alternative urban area-wide review (AUAR), stipulated that the city would be the responsible governmental unit (RGU) for the review, and required that the AUAR assess three different development scenarios. A draft AUAR was completed in May 2003, made available for public review, and sent to several entities for review and comment, including federal and state agencies, local governmental units, and the Environmental Quality Board (EQB), the state entity responsible for ensuring the effectiveness of the environmental-review rules. Notice of the draft was also published in the *EQB*

*Monitor.* A total of 20 different agencies, local units of government, nonprofit organizations (including MCEA), and individual citizens submitted comments. The RGU held open houses, workshops, and meetings to review and discuss the draft AUAR and comments to the draft.

In November 2003, a final AUAR was completed. The appendix to the final AUAR contained all of the comments submitted during the review process and was revised to incorporate the changes discussed at three joint workshops between the city and the township. The final AUAR was submitted to the EQB and all entities that commented on the draft. The Minnesota Department of Natural Resources (DNR) wrote a letter objecting to the final AUAR in March 2004, but the DNR withdrew its objection in May 2004 after additional meetings with the RGU. On May 17, 2004, the RGU adopted the final AUAR.

In June 2004, MCEA filed a complaint challenging the final AUAR. MCEA (1) alleged that the RGU improperly used an AUAR instead of an environmental-impact statement (EIS) to access the proposed development and that the AUAR inadequately assessed the environmental effects; (2) challenged the project settlement agreement between respondents and the township; and (3) claimed a violation of the Minnesota Environmental Rights Act, Minn.Stat. ch. 116B. A November 2004 stipulation and order dismissed most of the complaint, leaving only the issue of whether the RGU's decision on the adequacy of the AUAR was arbitrary or capricious and not supported by substantial evidence or contrary to applicable law.

The parties submitted cross-motions for summary judgment on this issue. The district court denied MCEA's motion, concluding that cumulative impacts *within* the AUAR-specified boundaries must be con-

sidered, but that cumulative impacts *beyond* the boundaries need not be considered. It also concluded that the AUAR is supported by substantial evidence and granted respondents' motion. This appeal followed.

## ISSUES

1. Did the AUAR process require the analysis of impacts on a geographical area larger than the project area selected by the RGU?

2. Was the final AUAR inadequate as a matter of law?

## ANALYSIS

"Where there is potential for significant environmental effects resulting from any major governmental action, the action shall be preceded by a detailed [EIS] prepared by the [RGU]." Minn.Stat. § 116D.04, subd. 2a (2004). An environmental-impact statement (EIS) analyzes in part a proposed project's "significant environmental impacts." *Id.* To determine whether significant environmental impacts or "effects" exist, an RGU must consider four criteria, the most relevant to this matter being the "cumulative potential effects of related or anticipated future projects." Minn. R. 4410.1700, subp. 7(B) (2005). A "cumulative impact" is the "impact on the environment that results from incremental effects of the project in addition to other past, present, and reasonably foreseeable future projects regardless of what person undertakes the other projects." Minn. R. 4410.0200, subp. 11 (2005).

Minnesota statutes, however, "identify alternative forms of environmental review which will address the same issues and utilize similar procedures as an [EIS] in a more timely or more efficient manner to be utilized in lieu of an [EIS]." Minn.Stat. § 116D.04, subd. 4a (2004). An AUAR can substitute for an EIS. Minn. R. 4410.3600,

subp. 1 (2005); Minn. R. 4410.3610 (2005). An AUAR's content and format must be similar to an environmental assessment worksheet (EAW), which is a "brief document ... designed to rapidly assess the environmental effects which may be associated with a proposed project" that aids in determining whether an EIS is needed. Minn. R. 4410.3610, subp. 4; Minn. R. 4410.1000, subp. 1 (2005). An AUAR "must provide for a level of analysis comparable to that of an EIS for impacts typical of urban residential, commercial, warehousing, and light industrial development." Minn. R. 4410.3610, subp. 4. If the RGU has adopted a comprehensive plan in compliance with specific rules, it has discretion to use an AUAR over an EIS. *See* Minn. R. 4410.3610, subp. 1 (providing that a "local unit of government may use the procedures" for an AUAR instead of an EIS if its comprehensive plan includes certain elements).

Under the AUAR process, the RGU first prepares a "draft environmental analysis document" that addresses the developmental scenarios established in the environmental-review rules. Minn. R. 4410.3610, subp. 5A. This draft is then distributed to the EQB and each of its members, the project proposer, federal agencies (including the Corps of Engineers, Environmental Protection Agency, and Fish and Wildlife Service), state agencies, a regional-development commission, all local governmental units within which the project will take place, and any other party who requests a copy. *Id.;* Minn. R. 4410.1500 (2005). The RGU is also required to publish notice of the draft in at least one newspaper of general circulation within the area of the project. Minn. R. 4410.1500. Reviewers have 30 days to submit written comments, and governmental reviewers are granted a 15–day extension upon request. Minn. R. 4410.3610,

subp. 5B. The RGU "shall revise the environmental analysis document based on comments received during the comment period." Minn. R. 4410.3610, subp. 5C. The RGU must include "a section specifically responding to each timely, substantive comment received that indicates in what way the comment has been addressed." *Id.*

After these revisions are made, the RGU must distribute the new document "in the same manner as the draft document and also to any persons who commented on the draft document." Minn. R. 4410.3610, subp. 5D. State agencies and the Metropolitan Council then have 10 days to file an objection to the revised document. *Id.* If no objection is made, the RGU must adopt the revised document at its next regularly scheduled meeting that is more than 15 days after distribution of the revised document. Minn. R. 4410.3610, subp. 5E. If an objection is filed, the RGU must consult with the objecting agency within five days and also advise the EQB about its proposed response to the objection. Minn. R. 4410.3610, subp. 5F. At the RGU's request, the objecting agency, the EQB staff, and any other affected agency must meet with the RGU. *Id.* Within 30 days after the objection, the RGU must submit a written response that addresses each issue raised to the objecting agency and the EQB chair. *Id.* The RGU can address each issue by either revising the environmental-analysis document or its mitigation plan, or by explaining why it believes the issue is not relevant to the identification and mitigation of potentially significant environmental impacts. *Id.* Within five days after the RGU's response, the objecting agency must advise the EQB chair of whether it accepts the response and withdraws its objection or continues to object. Minn. R. 4410.3610, subp. 5G. If the objection is continued, the EQB must place the matter on the agenda of its next scheduled meeting. *Id.* If the EQB finds the revised documents adequate, the RGU must adopt them. Minn. R. 4410.3610, subp. 5H. If the EQB determines that they are conditionally adequate, it must specify the necessary revisions, and the RGU must adopt the document with the directed revisions. *Id.* If the documents are inadequate, the RGU has 30 days to revise the documents and redistribute them for review under subparts 5D to 5H. *Id.* The RGU is also under a continuing obligation to update the AUAR and mitigation plan. *See* Minn. R. 4410.3610, subp. 7 (specifying scenarios under which the documents must be updated).

### 1. Necessity of Cumulative–Impact Analysis Beyond the AUAR–Specified Area

■ "When ... the language of an administrative rule is clear and capable of understanding, interpretation of the rule presents a question of law reviewed de novo." *Jasper v. Comm'r of Pub. Safety,* 642 N.W.2d 435, 440 (Minn.2002) (citation omitted). Summary judgment is proper when no genuine issue of material fact exists and when a determination of the applicable law will resolve the matter. *Offerdahl v. Univ. of Minn. Hosps. & Clinics,* 426 N.W.2d 425, 427 (Minn.1988).

■ MCEA's first argument is geographic: that the AUAR process required the RGU to analyze cumulative impacts on a geographic area larger than the area for environmental review selected by the RGU. Respondents do not dispute the need for cumulative-impacts analysis under an AUAR, but contend that the RGU is entitled to select the study area and is required to analyze cumulative impacts only in that area.

■ Under the AUAR process, "[t]he RGU shall adopt an order for each review

... that specifies the boundaries of the geographic area within which the review will apply." Minn. R. 4410.3610, subp. 3. The AUAR process can be used to "review anticipated ... developments ... in a particular geographic area within its jurisdiction." Minn. R. 4410.3610, subp 1. Furthermore, "determination of the extent and effect of [cumulative environmental impacts], and particularly identification of the geographic area within which they may occur, is a task assigned to the special competency of the appropriate agencies." *Kleppe v. Sierra Club*, 427 U.S. 390, 414, 96 S.Ct. 2718, 2732, 49 L.Ed.2d 576 (1976). Because the geographic boundary of the study area is left to the discretion of the RGU, a legal requirement that the RGU analyze cumulative impacts in an area beyond the proposed development is not supported by statute or rule.

To support its claim, MCEA relies primarily on a statement from the federal Council on Environmental Quality's (CEQ)[1] *Considering Cumulative Effects Under the National Environmental Policy Act* (Jan.1997): "When analyzing the contribution of this proposed action to cumulative effects, however, the geographic boundaries of the analysis almost always should be expanded." MCEA argues that reliance on this statement is appropriate because the EQB's own guidance for environmental review refers specifically to the CEQ's guidance on cumulative impacts.

■ Appellate courts "defer to an agency's interpretation of its own regulations." *Minn. Ctr. for Envtl. Advocacy v. Minn.*

*Pollution Control Agency*, 644 N.W.2d 457, 465 (Minn.2002) (citation omitted). The EQB provides guidance to RGUs in its *Guide to Minnesota Environmental Review Rules* (Apr.1998). In its discussion of cumulative impacts for an EIS, the EQB states that it "is currently studying cumulative impact issues and may ultimately propose changes in the rules or statutes.... In the meantime, the best source of guidance on cumulative impacts is the [CEQ's] *Considering Cumulative Effects under the National Environmental Policy Act*." But the EQB guide makes no reference to an expanded geographic requirement in its discussion of cumulative impacts for either an EIS or AUAR. In fact, the EQB guide provides that an AUAR's "key feature is that its subject is a development scenario or several scenarios for an entire geographical area rather than a specific project." An AUAR "is an excellent tool for review of cumulative impacts of multiple projects in a given area." Coupled with the RGU's discretion in selecting a geographical area for review, the AUAR process does not require the analysis of cumulative impacts beyond the selected area.[2]

MCEA also cites several cases to support its position. It cites *Trout Unlimited, Inc., v. Minn. Dep't of Agric.*, 528 N.W.2d 903 (Minn.App.1995), *review denied* (Minn. Apr. 27, 1995), for the proposition that an RGU "must consider the impacts of many different irrigation and chemigation projects on the environment,

---

1. The CEQ is a federal agency charged with promulgating rules under the National Environmental Protection Act. 42 U.S.C. § 4342 (2000).

2. MCEA also asserts that the "EQB's express reliance on, and citation to, the CEQ Guidance demonstrates EQB's intention to cast the cumulative effects analysis net much wider than a project's specific boundaries." The

EQB, however, has statutory authority to promulgate rules for environmental review, including, if it chooses, a rule to enhance or specifically define the geographical scope for review. The fact that it has not done so supports the argument that RGUs are entitled to use their discretion in selecting the area for review.

regardless of their specific relationship to the project under consideration." But *Trout Unlimited* is distinguishable. It held that the commissioner's conclusion— that potential impacts from future projects could not be inferred from the proposed project—was arbitrary because the "EAW itself stated that future stages of irrigation projects in the area were 'planned or likely.'" *Id.* at 908. Here, the record shows no evidence that the RGU has knowledge of future projects in the area of the proposed development. Likewise, the remaining cases cited to support MCEA's position interpret the national Environmental Protection Act and its regulations,[3] and several are distinguished by the fact that the RGU did not analyze impacts from other known projects. *See Klamath–Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 994 (9th Cir.2004) (assessing direct cumulative effects "without regard to the other projects in the ... watershed"); *Grand Canyon Trust v. FAA*, 290 F.3d 339, 345 (C.A.D.C.2002) (concluding that the FAA analyzed only the incremental increase in noise pollution by a replacement airport, not the "total noise impact" on the area); *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 810 (9th Cir.1999) (ignoring cumulative impacts of "existing logging and other disturbances"); *Fritiofson v. Alexander*, 772 F.2d 1225, 1247 (5th Cir.1985) (noting that the environmental assessment ignored "other actions" that "may affect the same area" as the proposed project); *Habitat Educ. Ctr. v. Bosworth*, 363 F.Supp.2d 1070, 1077–78 (E.D.Wis.2005) (noting that the Forest Service ignored five nearby projects in setting the boundaries for an EIS and relying on CEQ guidance that an agency should consider the presence of and effect on species outside the project area). *See also Kleppe*, 427 U.S. at 410 n. 20, 96 S.Ct. at 2730 (stating that the NEPA "speaks solely in terms of *proposed* actions; it does not require an agency to consider the possible environmental impacts of less imminent actions when preparing the impact statement on proposed actions").

As the district court did, we also share MCEA's concern about potential environmental impacts from the development of the property. But our decisions are controlled by what the law is, not what we think it should be. Policy decisions are the prerogative of the legislature. We also recognize the potential for abuse in setting the AUAR boundary, and our opinion is in no way meant to preclude claims that an RGU acted arbitrarily and capriciously in determining the geographic area for review. But MCEA does not argue on appeal that the RGU here acted in an arbitrary or capricious manner when it selected the area for review. And although several commentators to the draft AUAR, including MCEA, suggested that the RGU was misusing the AUAR process, this claim is not before us on appeal. *See Melina v. Chaplin*, 327 N.W.2d 19, 20 (Minn.1982) (stating that issues not briefed on appeal are waived); *see also Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn.1988) (stating that appellate courts generally will not review matters not argued and considered in the court below). Lastly, we note that the decision of an RGU to bypass an EIS and use the AUAR process is reviewable in a declaratory-judgment action. *See* Minn.Stat. § 116D.04, subd. 10 (2004)

---

3. "[L]ooking to federal case law is appropriate and helpful" when the procedural protections of MEPA at issue are similar to the federal protections in NEPA. *Minn. Ctr. for Environmental Advocacy v. Minn. Pollution Control Agency*, 644 N.W.2d 457, 468 n. 10 (Minn.2002).

(providing 30 days to challenge a decision on the need for an EIS).

### 2. AUAR Assessment of "Cumulative Impacts"

 MCEA argues that regardless of the boundary of the review area, the RGU's adoption of the AUAR was inadequate under the law because the AUAR failed to "assess[ ] the cumulative impacts from the Project and past, present and future projects, on the Mississippi Critical Area." We review an agency decision to determine if it was "unsupported by substantial evidence in view of the entire record as submitted or was arbitrary or capricious." *Minn. Ctr. For Envtl. Advocacy v. Minn. Pollution Control Agency,* 644 N.W.2d 457, 464 (Minn.2002). "Substantial evidence" is (1) relevant evidence that a reasonable person might accept as adequate to support a conclusion; (2) more than a scintilla of evidence; (3) more than some evidence; (4) more than any evidence; and (5) evidence considered in its entirety. *Cable Communications Bd. v. Nor–West Cable Communications P'ship,* 356 N.W.2d 658, 668 (Minn.1984). A decision is "arbitrary or capricious" when

> the agency relied on factors the legislature never intended it to consider, if it entirely failed to consider an important aspect of the problem, if it offered an explanation for the decision that runs counter to the evidence, or if the decision is so implausible that it could not be ascribed to a difference in view or the result of agency expertise.

*Pope County Mothers v. Minn. Pollution Control Agency,* 594 N.W.2d 233, 236 (Minn.App.1999) (citation omitted). If an agency engages in reasoned decision-making, we will affirm, even though we may have reached a different decision had we been the fact-finder. *Cable Communications,* 356 N.W.2d at 669. But when a "combination of danger signals ... suggest the agency has not taken a 'hard look' at the salient problems," and the decision lacks "articulated standards and reflective findings," we will intervene. *Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 825 (Minn.1977).

 MCEA first points to the RGU's response to the cumulative-impacts section of the AUAR. The AUAR requests that the RGU "[i]dentify any past, present or reasonably foreseeable future projects that may interact with the project described in this EAW in such a way as to cause cumulative impacts."[4] In response, the AUAR adopted by the RGU cites the EQB's *Recommended Content and Format Alternative Urban Areawide Review Documents* (revised Oct. 2, 2000), a document that assists in the preparation of an AUAR, and states: "Cumulative Impacts. This item does not require a response for an AUAR since the entire AUAR process deals with cumulative impacts from related developments within the AUAR area." MCEA claims that this response evades the need to consider cumulative impacts.

But the AUAR is clearly designed to address cumulative impacts. The working group that originally devised the AUAR process stated that an AUAR "provides an excellent tool for review of the cumulative impacts of multiple projects in a given area." The EQB guidance for environmental review makes this same statement and also claims that "[w]hen cumulative impacts from concurrent or future projects are likely to be significant, review can often be better accomplished through the

---

4. The EAW is the form an RGU follows to create an AUAR. *See* Minn. R. 4410.3610, subp. 4 (providing that the "content and format [of an AUAR] must be similar to that of the EAW").

[AUAR] process or the related actions EIS." Even the EQB's *Recommended Content and Format Alternative* provides that "the entire AUAR process deals with cumulative impacts from related developments." The AUAR's failure to specifically address this question in the AUAR does not render the final AUAR inadequate.[5]

MCEA also claims that the "selective impacts the AUAR did examine are those least damaging ... and that have no bearing ... to the Mississippi Critical Area" and that the AUAR makes "no list, or even mention, of past, present, or reasonably foreseeable future projects in or on the Mississippi Critical Area." MCEA argues that the AUAR does not address habitat fragmentation and river-edge effects in the Mississippi corridor and the metropolitan region as a whole or impacts to mussel and large-bird species on the property site.

The record, however, shows that the AUAR considers several cumulative impacts. It addresses the impact of the development on "three Bald Eagle nests within 1 mile of the AUAR" and revises the development scenarios to move potential disturbances away from these nests. It also addresses three threatened mussel species "living in the Mississippi River in the vicinity of the AUAR area" and concludes that the three development scenarios would not create potential significant impacts. The AUAR responds to an inquiry into endangered or threatened species, rare plant communities, and other sensitive ecological resources, and identifies "27 known occurrences of rare species or natural communities within an approximate one-mile radius from the AUAR area." Among other mitigating measures, the AUAR notes that existing habitat areas will remain unchanged, requires site-spe-

cific plans to restore and improve native plant communities, proposes a "100–foot structure and road setback to the bluff-line" to protect ecologically sensitive resources, and relocates trails away from eagle nests.

Furthermore, the AUAR addresses the physical impacts to "any surface water" from "any residential or commercial development expected to physically impact any water resources." It proposes restoration and repair of an old manure lagoon and related erosion, construction of two "outfall structures" above the Mississippi's high-water mark as part of the storm-water management system, and implementation of on-site filtration for treated storm water. Addressing water-surface use on "any water body," the AUAR describes the increased water-surface use resulting from the development scenarios and states that "[m]otorized boat access is not proposed." The AUAR also discusses water quality, the effect of surface-water runoff on "receiving water bodies ..., includ[ing] major downstream water bodies," and mitigation measures for both the entire AUAR area and a "Bay Area."

MCEA criticizes the AUAR's mitigation plan, alleging that there is limited discussion of the Mississippi Critical Area and mitigation measures that "simply chang[e] the law and protective designation." An AUAR must identify and discuss measures to mitigate potential environmental impacts. Minn. R. 4410.3600, subp. 1D. "Mitigation" means (1) avoiding impacts by not pursuing certain parts of a project; (2) minimizing impacts by limiting the project's magnitude; (3) rectifying impacts through repair, rehabilitation, or restoration of the affected environment; (4) reducing or eliminating impacts over time

---

5. MCEA notes that the EQB revised its guidelines to recommend assessing the cumulative impacts outside the AUAR boundary. But the revisions MCEA cites were implemented in July 2004, after the RGU adopted the final AUAR.

through preservation and maintenance; (5) compensating for impacts by replacing or providing resources; or (6) reducing or avoiding impacts through pollution-prevention measures. Minn. R. 4410.0200, subp. 51 (2005). Mitigation measures must be "more than mere vague statements of good intentions." *Iron Rangers for Responsible Ridge Action v. Iron Range Res.*, 531 N.W.2d 874, 881 (Minn.App.1995) (quoting *Audubon Soc'y v. Dailey*, 977 F.2d 428, 435–36 (8th Cir.1992)), *review denied* (Minn. July 28, 1995).

MCEA points only to the discussion of the Mississippi Critical Area under the "Water-related Land Use Management Districts" portion of the AUAR. It ignores the other parts of the AUAR discussed above that relate to the Mississippi River. It also ignores the entire mitigation plan contained in the AUAR, including extensive and specific mitigation measures concerning fish, wildlife, and ecologically sensitive areas; wetlands, the Mississippi River, and backwaters; surface-water runoff and wastewater; geological hazards and soil conditions; and "sensitive resources" with archeological, architectural, historical, and recreational value. For example, the mitigation plan mandates that the city and township "[r]equire a site-specific ... [p]lan to restore and improve native plant communities and to offset the impact of converting agricultural, deciduous forest and woodlands, and prairie remnant habitat." The mitigation plan proposes "a 100–foot structure and road setback to the bluffline ... to protect ecologically sensitive resources such as the river, river bluffs, [and] shoreline." Under the plan, the city and township will protect the majority of existing habitat areas from development to maintain the existing riparian habitat, wildlife corridor, and migratory bird corridor and will "[d]evelop a tree preservation plan that will provide feasible and reasonable guidelines for mitigating impacts to desirable" tree species located outside of existing and proposed protection areas.

Relating to the Mississippi River, the mitigation plan directs the city and township to "[r]equire discharge from the storm water outfall structure ... to be directed to a wetland stilling basin to provide secondary removal of suspended sediment and nutrients prior to discharge to the river bay." Storm water from another area of the property must be "directed to a 2–cell treatment area ... to capture and treat runoff from the proposed buildings and surrounding undisturbed land" and to provide removal of sediments and nutrients prior to entering the Mississippi River. To protect water quality, the city and township must "not permit new development to proceed if it exceeds the capacity of the waste supply system." To control erosion, the city and township will "require temporary catch basins during grading activities on highly erodible soils," require private developers to "submit detailed erosion and sediment control plans for review and approval to the city or township prior to project construction," and apply for a permit from the Minnesota Pollution Control Agency that requires "the MCEA's Best Management Practices be used to control erosion and that all erosion controls be inspected after each rainfall exceeding 0.1 inch of precipitation."

Five government agencies, five local units of government, four nonprofit organizations, and six citizens submitted comments to the draft AUAR. The final AUAR contains detailed and sufficient responses to the substantive comments. For instance, several commentators complained that the AUAR underestimated the impacts on wildlife. The RGU admitted that some local decline in wildlife is expected from the development and that regional

development pressures were causing total habitat to decline. But the RGU responded that "[p]reservation of riverine habitat, restoration of native vegetation communities, and increased setbacks along the bluffs are expected to mitigate adverse effects on wildlife." Trails and other disturbances were moved further away from bald-eagle nests and "upland buffers extending to 100 feet landward [of] the bluffline will help mitigate potential impacts on many migratory birds." The final AUAR includes and responds to more than 80 separate comments.

We find it significant that the DNR, whose mission[6] is in part to "work with citizens to conserve and manage the state's natural resources . . . and to provide for commercial uses of natural resources in a way that creates a sustainable quality of life," withdrew its objection to the AUAR. In objecting, the DNR complained that the final AUAR and Mitigation Plan contained inaccurate or incomplete information relative to the identification and mitigation of potentially significant environmental impacts. The DNR felt it was important to inquire into the significant increase in building density, proposed changes in use, and the locations and sizes of the development within the Critical Area. Yet despite these concerns, the DNR withdrew its objection after "beneficial" meetings with the city, township, developer, and consultants. Importantly, the DNR noted that it "recognize[s] that the level of project specific detail needed to fully evaluate the potential for significant impacts is not required by the AUAR process." The DNR's objection was the last item preventing the RGU from adopting the final AUAR. By withdrawing its objection, the DNR permitted the RGU to adopt the final AUAR.

Based on the analysis of cumulative impacts, creation of a mitigation plan, and consideration of submitted comments, the RGU's adoption of the AUAR was supported by substantial evidence and was not arbitrary or capricious.

## DECISION

The rules regarding the use of the AUAR do not require an RGU to assess cumulative impacts outside the area selected for environmental review. Here, the RGU's adoption of the AUAR is supported by substantial evidence and is not arbitrary or capricious.

**Affirmed.**

LANSING, Judge (dissenting).

I respectfully dissent. Three fundamental principles apply in this case. First, an urban areawide review (AUAR) must evaluate cumulative impacts caused by the project. Second, cumulative impacts, unlike direct impacts, are impacts outside the project area. Third, no evaluation of public responses or mitigation proposals can be adequate if a responsible governmental unit (RGU) does not properly evaluate cumulative impacts to determine what is necessary.

Although the alternative AUAR process provides for a more streamlined review of the environmental impacts of a development project than an environmental impact statement (EIS), nothing in the AUAR rules relieves an RGU of its obligation to engage in reasoned decision-making and to issue written findings in support of its determinations. *See* Minn. R. 4410.3610 (2005) (specifying process for AUAR); *Reserve Mining Co. v. Minn. Pollution Control Agency*, 364 N.W.2d 411,

---

6. *See* Minnesota Dep't of Natural Res., *A Strategic Conservation Agenda 2003–2007* (Mar. 2005), *available at* http://files.dnr.state.mn.us /aboutdnr/reports/conservationagenda/fulldoc.pdf (last visited Jan. 27, 2006).

414–15 (Minn.App.1985) (concluding that agency's failure to provide written findings and reasons for its determination was arbitrary and capricious), *review dismissed* (Minn. June 10, 1985). Neither does the AUAR process eliminate the need to examine cumulative impacts outside the project area. To the contrary, an AUAR "must provide for a level of analysis comparable to that of an EIS for [environmental] impacts." Minn. R. 4410.3610, subp. 4.

The district court concluded that "[t]here are no specific requirements that the AUAR consider cumulative impacts outside of the AUAR area." But both the rules and the cases to which we look for interpretation of these rules state otherwise. The AUAR process requires the RGU, as an initial step, to "adopt an order for each review … that specifies the boundaries of the geographic area within which the review will apply and specifies the anticipated nature, location, and intensity of [development] within those boundaries." *Id.*, subp. 3. This initial step need not be as comprehensive as the full scoping process of an EIS, but the RGU must define the geographic boundary of the AUAR in an independent order before the RGU may draft an AUAR. Envtl. Quality Bd., *Guide to Minnesota Environmental Review Rules* 15–16 (1998).

The depth of analysis required for the selection of the geographic boundary is clearly set forth in federal caselaw. Although the RGU has discretion to select the geographic boundary for analysis of cumulative impacts of the project, the selection must "represent a reasoned decision and cannot be arbitrary." *Habitat Educ. Ctr., Inc. v. Bosworth,* 381 F.Supp.2d 842, 849 (E.D.Wis.2005) (quoting *Idaho Sporting Cong., Inc. v. Rittenhouse,* 305 F.3d 957, 973 (9th Cir.2002)) (concluding that agency's geographic-boundary determination was arbitrary);

*see also Kleppe v. Sierra Club,* 427 U.S. 390, 414, 96 S.Ct. 2718, 2732, 49 L.Ed.2d 576 (1976) (requiring deference to agency's selection of scope of analysis). The agency's decision must provide support for its selection and demonstrate that it considered the relevant factors. *Native Ecosystems Council v. Dombeck,* 304 F.3d 886, 902 (9th Cir.2002); *Bosworth,* 381 F.Supp.2d at 849. "The presence of species habitat outside the project area is … a relevant consideration in determining the geographic scope of a cumulative impacts analysis." *Bosworth,* 381 F.Supp.2d at 849; *see also TOMAC, Taxpayers of Mich. Against Casinos v. Norton,* 433 F.3d 852, 864 (D.C.Cir.2006) (construing federal requirement to examine cumulative effects to mandate consideration of cumulative impacts outside project area, but within same geographic area); *Selkirk Conservation Alliance v. Forsgren,* 336 F.3d 944, 958 (9th Cir.2003) (requiring consideration of cumulative impacts in selection of geographic boundary).

The record provides no order that sets forth the reasons for selecting the geographic boundary of the cumulative-impacts analysis. The AUAR itself refers to the geographic boundary of the project area as the geographic boundary of the cumulative-impacts review but, again, contains no discussion of the reasons for its decision to limit its analysis to the project area and no indication that the RGU considered cumulative impacts outside the project area.

The procedural failure to make an initial geographic-boundary determination that accounts for cumulative impacts outside the project area results in a legally deficient substantive consideration of these effects in the AUAR process. The limitation on the consideration of the appropriate geographic scope at the outset necessarily reduces the scope of analysis in the subse-

quent processes, and the overall substantive consideration becomes arbitrary. *See Bosworth*, 381 F.Supp.2d at 850 (observing that failure to explain reasons for selecting geographic boundary adversely affects decision-making process and renders determination arbitrary). The failure to consider the project's impact outside the project area at any point in the determination defeats the ordinary deference that this court accords to agency decisions. *See id.* (stating that failure to discuss selection of area indicates agency did not employ reasoned decision-making); *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 825 (Minn. 1977) ("[W]here there is a combination of danger signals which suggest the agency has not taken a hard look at the salient problems and has not genuinely engaged in reasoned decision making it is the duty of the court to intervene." (quotation omitted)).

The majority recognizes "the potential for abuse in setting the AUAR boundary," but interprets MCEA's appeal to be limited solely to the adequacy of the final AUAR document. Whether the question is framed substantively or procedurally, the issue at the heart of the appeal remains the same: the failure to consider cumulative impacts outside the project area. The purpose of requiring a cumulative-impacts analysis is to "preclude the breaking down of projects into small component parts to avoid cumulative significance." *Colo. Wild v. U.S. Forest Serv.*, 435 F.3d 1204,. 1221 (10th Cir.2006). The AUAR's omission of the required cumulative-impacts analysis creates a significant risk of· serious environmental harm because the geographic area immediately surrounding the project area is designated as a critical area. The existence of the critical area not only highlights the potential for irreversible damage to important environmental resources, but also provides an alternative and readily definable geographic boundary for the AUAR.

Although a significant number of public comments were submitted throughout the AUAR process, the absence of an explicit decision on the geographic boundary of the AUAR "deprived the public of an opportunity to comment on the issue and thus assist in the decision-making process." *See Bosworth*, 381 F.Supp.2d at 850 (expressing concern that procedural flaw undermines purpose of review process). The RGU cannot evade responsibility for a decision by failing to make it. The procedural irregularities are also evidenced by the evolving position of the Minnesota Department of Natural Resources (DNR). The DNR initially objected to the AUAR and later withdrew its objection. But the DNR renewed its objection in an amicus brief on appeal because of the AUAR's failure to examine cumulative impacts outside the project area. In its brief, the DNR emphasizes the heavy ecological price of piecemeal development of discrete portions of land within the Mississippi River Corridor Critical Area without considering the environmental impacts on the entire critical area.

Requiring the RGU to consider cumulative impacts outside the. project area does not preclude development in the area. Rather, it ensures that the purposes of the Minnesota Environmental Policy Act are fulfilled by fostering informed decision-making and by avoiding incremental analysis that fails to assess adequately a project's impact on the environment. Because the AUAR fails to comply with the requirements to analyze cumulative impacts outside the project area and is therefore inadequate, I would reverse the district court's grant of summary judgment.