*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-1866**

Scott Marshall Karo, petitioner,
Appellant,

vs.

Commissioner of Public Safety,
Respondent.

**Filed July 14, 2014
Affirmed
Ross, Judge**

Hennepin County District Court
File No. 27-CV-13-4991

Charles A. Ramsay, Daniel J. Koewler, Ramsay Law Firm, P.L.L.C., Roseville, Minnesota (for appellant)

Lori Swanson, Attorney General, Jacob Fischmann, Assistant Attorney General, Rory Christopher Mattson, Assistant Attorney General, Uzodima Franklin Aba-Onu, Assistant Attorney General, St. Paul, Minnesota (for respondent)

Considered and decided by Ross, Presiding Judge; Bjorkman, Judge; and Reilly, Judge.

**U N P U B L I S H E D   O P I N I O N**

**ROSS**, Judge

Scott Karo participated in a breath test after police arrested him on suspicion of driving while impaired. The DataMaster testing device detected an interfering substance

on Karo's first attempt, and the officer reset the machine and administered a second test that revealed an alcohol concentration exceeding the per se intoxication limit. The commissioner of public safety revoked Karo's license and the district court upheld the revocation. Because Karo consented to the breath test and the result was reliable, we affirm.

## FACTS

South Lake Minnetonka Police Officer Ricky Syhre arrested Scott Karo for driving while impaired. Officer Syhre drove Karo to the police department where he read Karo the implied-consent advisory required by statute. Karo contacted an attorney and then agreed to take a breath test. Syhre began observing Karo at 12:44 a.m. and did not see Karo place anything in his mouth, burp, regurgitate, or engage in any other activity that might have affected the alcohol-concentration test results.

Sergeant Mark Geyer, current in his DataMaster training, administered the test at 1:10 a.m. after he checked Karo's mouth and assessed the DataMaster's diagnostics to ensure it was working properly. The machine detected an interfering substance and stopped the test. The DataMaster's handbook directed Sergeant Geyer to perform a second test. It identified two circumstances that could cause the machine to report an interfering substance: a foreign substance is on the test subject's breath or the DataMaster's fuel cell is turned on but unresponsive. The fuel cell on this DataMaster was turned off. Sergeant Geyer asked Karo if he was diabetic, and Karo said, no. The sergeant recalibrated the machine and allowed it to run a self-diagnostic test. The diagnostic test indicated that the machine was working properly. Geyer administered a

2

second test at 1:18 a.m., revealing an alcohol concentration of about .11. The machine reported no interfering substances.

The commissioner revoked Karo's drivers license because of the positive test. Karo filed for judicial review, challenging the reliability and accuracy of his breath test results, and, relying on *Missouri v. McNeely*, 133 S. Ct. 1552 (2013), arguing that the test constituted an unreasonable warrantless search that violated his Fourth Amendment rights.

Karo relied on the purportedly expert testimony of witness Thomas Burr and argued that Sergeant Geyer's procedure after the interfering-substance indication contradicted scientific norms. Burr explained that DataMaster machines rely on two mechanisms to test a subject's breath—a fuel cell and infrared radiation. The reason for two mechanisms, according to Burr, is to better detect interfering substances. He testified that the machine reports interference both when a fuel cell is activated but malfunctions and when there is an interfering substance on the subject's breath. If the fuel cell is activated, the proper procedure following an interfering-substance report is to retest the subject. But he maintained that if the cell is turned off (as in this case) the proper procedure is to forego a breath test and test the subject's blood or urine. Burr stated that this alternative-test procedure is followed in two other states, Iowa and Washington, and that it was the procedure in Minnesota when the state used the Intoxilyzer machine, which relied solely on infrared technology.

Burr testified that an interfering-substance report can result from burping, regurgitating, a substance or object being in the subject's mouth, or compounds like

acetone, which is commonly found in diabetics, being in a subject's bloodstream. Because the fuel cell was not activated during Karo's test, Burr opined that the interference report necessarily resulted from a substance on Karo's breath. Because nothing was in Karo's mouth and neither officer witnessed him burp or regurgitate, Burr induced that the interference reading was caused by a substance in Karo's blood that could not have dissipated within the few minutes between tests. Burr concluded that the second breath test was therefore not reliable and artificially inflated the report of Karo's alcohol concentration.

The commissioner's counsel cross-examined Burr about his expertise and opinion. He asked Burr to cite scientific journals supporting his conclusion, and Burr could not. He questioned Burr's knowledge of DataMaster procedures in other states, and although Burr knew that multiple other states use the device, he was familiar with the procedures only in Iowa and Washington. He highlighted the apparent accuracy of the second test, drawing Burr to admit that the only reason to doubt the reliability of the second test was the interference indication in the *previous* test. Burr admitted that he "ha[d] no idea" what substance caused that interference indication.

The district court denied Karo's petition to rescind his revocation. It rejected Karo's argument that the Fourth Amendment prohibited the test. And it found that the commissioner had met her prima facie burden to show that the test was reliable and Karo had failed to rebut that showing. It specifically found Burr's testimony unconvincing because he could cite no publication that supports his view, he could not discuss the

4

procedures in states other than Iowa and Washington, and he was not trained or experienced with DataMaster technology.

Karo appeals.

**D E C I S I O N**

**I**

Karo asserts that the district court erred by admitting the fruits of an unconstitutional search. We apply the same Fourth Amendment principles in this review of the civil license-revocation proceeding that we apply in criminal cases. *See Knapp v. Comm'r of Pub. Safety*, 610 N.W.2d 625, 628 (Minn. 2000). When the facts are not in dispute, our Fourth Amendment review is de novo. *State v. Othoudt*, 482 N.W.2d 218, 221 (Minn. 1992). We will not reverse a district court's decision simply because it relied on incorrect reasoning. *Katz v. Katz*, 408 N.W.2d 835, 839 (Minn. 1987).

The commissioner argues that the district court appropriately admitted Karo's test result because Karo consented to the test. The federal and state constitutions protect citizens from unreasonable searches and seizures. U.S. Const. amend. IV; Minn. Const. art. I, § 10. A breath test is a search under the Fourth Amendment. *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 616–17, 109 S. Ct. 1402, 1413 (1989). Warrantless searches are per se unreasonable unless an exception to the warrant requirement exists. *State v. Flowers*, 734 N.W.2d 239, 248 (Minn. 2007). Valid, voluntary consent is one exception. *Othoudt*, 482 N.W.2d at 222. The commissioner must show that the consent was voluntary. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S. Ct. 2041, 2045 (1973); *State v. Diede*, 795 N.W.2d 836, 846 (Minn. 2011). To determine whether consent was

5

voluntary, we evaluate the totality of the circumstances. *State v. Brooks*, 838 N.W.2d 563, 568 (Minn. 2013), *cert. denied*, 134 S. Ct. 1799 (2014). Consent is not involuntary simply because the decision to allow a search is difficult. *Id.* at 569.

Karo argued in his initial brief to the trial court that any "consent" he gave was involuntary because he was coerced solely by the implied-consent statute. The record is devoid of any other evidence of coercion and the only coercion Karo claims is the force of the implied-consent statute. But this argument is foreclosed by the holding in *Brooks* that the mere threat of a criminal charge for refusal is not enough to unduly coerce a person's consent to submit to a breath test. 838 N.W.2d at 570. Karo was arrested, taken into custody, and read the implied-consent advisory, spoke to an attorney, and then agreed to take a breath test. Karo's agreement to take the test under these circumstances indicates consent, and he offers no evidence of coercion. We see no reason under the Fourth Amendment to reverse.

## II

Karo argues alternatively that the district court erred by relying on the test results to uphold his revocation. The commissioner points out that Karo did not object to the admission of the breath test when it was introduced into evidence, failing to preserve the challenge he now makes on appeal. When the district court asked whether Karo had any objection to the test results, his attorney responded, "Not without waiving the issue." Although this apparent choice not to object waived Karo's challenge to the admissibility of the evidence, he is not foreclosed from arguing that the evidence lacks sufficient weight. *See Hounsell v. Comm'r of Pub. Safety*, 401 N.W.2d 94, 95–96 (Minn. App.

6

1987) (explaining that objecting to the admission of results and impeaching the reliability of those results differ).

The commissioner bears the burden of proof in an implied-consent proceeding to demonstrate a prima facie case that a test result was reliable. *Genung v. Comm'r of Pub. Safety*, 589 N.W.2d 311, 313 (Minn. App. 1999), *review denied* (Minn. May 18, 1999). We have previously held that a breath test "is sufficiently accurate for revoking a license if the procedures promulgated by the commissioner have been followed." *Id.* at 314. So the commissioner's initial burden is satisfied by showing that a person trained to use the breath-testing machine administered the test and followed procedure. *Id.* If the commissioner makes the initial showing, the burden of production shifts to the defendant to introduce evidence, rising above mere speculation, that the test is untrustworthy. *Roettger v. Comm'r of Pub. Safety*, 633 N.W.2d 70, 74 (Minn. App. 2001). We review burden of proof determinations de novo. *Genung*, 589 N.W.2d at 313. But we defer to the district court's factual findings, relying on them unless they are clearly erroneous. *Id.* When facts are sought to be proved by experts, we rely heavily on the district court's credibility determinations. *See* Minn. R. Civ. P. 52.01; *Jasper v. Comm'r of Pub. Safety*, 642 N.W.2d 435, 440 (Minn. 2002). And district courts have discretion to determine whether a witness qualifies as an expert. *See* Minn. R. Evid. 702 1977 comm. cmt.

The district court found that the commissioner met her prima facie showing that the second test was reliable. This finding is not clearly erroneous. Geyer was trained as a DataMaster operator and followed the specified procedures. This satisfies the

7

commissioner's prima facie burden. *See Genung*, 589 N.W.2d at 314. The burden of production then shifted to Karo to demonstrate that the test was unreliable.

Karo relies on Burr's testimony to argue that the procedures followed here were outdated and the results unreliable. But the district court doubted Burr's expertise and found his testimony unpersuasive. The credibility finding is within the district court's discretion and, we add, well supported on the record. Burr identified no scientific publication that supported his opinion, which he apparently based on the anecdotal approach of only two states. We observe that, according to Burr's curriculum vitae, Burr attended a course on "Datamaster DMT Operation, Design, Scientific Principles and Subject Testing." Although the district court's findings do not acknowledge this background, they are nevertheless supported by the record for the reasons stated.

**Affirmed.**