**In the Matter of an Application by Harvey BLOCK and Gary McDuffee for a Conditional Use Permit.**

**Nos. A06–387, A06–518.**

Court of Appeals of Minnesota.

Feb. 6, 2007.

Marshall H. Tanick, Teresa J. Ayling, Beth Erickson, Mansfield, Tanick & Cohen, P.A., Minneapolis, MN, for relators Roger E. Nelson, et al.

Richard D. Snyder, Sten–Erik Hoidal, Fredrikson & Byron, P.A., Minneapolis, MN and Timothy J. Shields, Richfield, MN, for relator Minnesota Federated Humane Societies.

Conrad Freeberg, Morrison County Attorney, Little Falls, MN and Michael T. Rengel, Pemberton, Sorlie, Rufer & Kershner, P.L.L.P., Fergus Falls, MN, for respondent Morrison County.

Konstandinos Nicklow, Meshbesher & Spence, Ltd., Minneapolis, MN and Douglas P. Anderson, Rosenmeier, Anderson & Vogel, Little Falls, MN, for respondent Gary McDuffee.

Considered and decided by HALBROOKS, Presiding Judge; RANDALL, Judge; and STONEBURNER, Judge.

## O P I N I O N

RANDALL, Judge.

In these consolidated certiorari appeals, relators Roger and Deborah Nelson and Jeremy and Sarah Dickman (the Nelson relators) and the Minnesota Federated Humane Societies (MFHS) seek review of respondent Morrison County Board of Commissioners' decision to grant a conditional use permit (CUP) to respondent Gary McDuffee to operate a dog-breeding facility. The Nelson relators argue that the county board's issuance of the CUP was arbitrary, capricious, or unreasonable; that the county board violated county ordinances and likewise was arbitrary, capricious, or unreasonable when it sua sponte modified the CUP; and that they were entitled to a new hearing based on new evidence. MFHS contends that the inclusion of a debarking condition was arbitrary and capricious, and that the board acted arbitrarily by failing to consider whether a large number of dogs could be humanely kept at the facility. We reverse and remand.

## FACTS

In late 2005, Gary McDuffee was interested in purchasing 40 acres of land from Harvey Block[1] in Morrison County, Minnesota, where he planned to relocate his professional dog-breeding facility. The land is zoned agricultural, and dog kennels are a permitted use with a conditional use permit (CUP).

---

1. This court dismissed Block and his wife from the lawsuit because the land has been sold to McDuffee and the Blocks no longer have an interest in it.

On November 8, 2005, Block and McDuffee filed a request for a CUP. As part of the application, McDuffee completed the conditional use criteria questions, which track the criteria for granting CUPs set out in the Morrison County land use ordinance. Morrison County, Minn., Ordinances 507.2. McDuffee indicated that he planned to relocate his professional dog-breeding business from elsewhere in Morrison County to the land at issue, where he planned to raise and sell puppies to be sold in pet stores nationwide. He estimated that he would have two to three full-time employees. A professional contractor would construct the building. He noted that he had operated dog kennels elsewhere in Morrison County under a CUP for the past 24 years and that his business would be licensed and inspected by the United States Department of Agriculture (USDA). He indicated that all adult dogs would be "debarked" to alleviate the noise.

McDuffee also submitted several letters in support of his CUP application. First, he submitted four letters from neighbors of his previous kennels who spoke well of him and his business. He also submitted four letters from people who would be his neighbors at the new location who did not object to his proposal. A letter from his accountant indicated that his business would be well run and profitable. A letter from his long-time veterinarian, Dr. Charles Extrand, indicated that McDuffee's previous facilities were well run and also addressed the issue of debarking.

> Noise generated from a dog kennel can be a very serious environmental factor and could affect surrounding inhabitants. With this in mind, Gary has contacted me about doing a debarking procedure to lower the noise volume. Contrary to what animal activists claim, this procedure does not "silence" a dog but rather lowers the high pitch[ed] sounds.

The Morrison County Planning Commission published notice of the public hearing on December 4, 2005, and mailed a notice to the ten closest owners. The notice invited participation at the hearing and also invited the submission of written comments. Planning commission staff prepared an opinion/recommendation for the hearing before the planning commission as follows:

> The applicant requires a conditional use permit to operate a dog kennel. The applicant operated a kennel in Cushing Township which was approved in 2001. The proposed kennel would breed and raise dogs for sale. A large housing barn is being proposed on the site. The applicant did not indicate the number of animals that are being proposed at the site. The Cushing site had a maximum cap of 800 adult dogs. There are neighbors within 900–1,000 feet from this proposed site. We have also received concerns from neighbors regarding this proposal. It is our understanding the animals are mostly confined to the barn and there is minimal exposure to the outside. It is indicated that those dogs outside will be debarked. A septic system is being proposed by the applicant. There appears to be tillable land for manure application. The property also has some wetlands. The ordinance does not have any specific standards for kennels. The conditional use criteria questions must be satisfied.

On December 9, 2005, relator Roger Nelson, who is one of the neighbors who was notified, filed a citizens' petition asking the township supervisors and county commissioners to vote against the proposed CUP for the dog kennel and requesting that an environmental assessment worksheet (EAW) be completed. In his letter to the Minnesota Environmental

Quality Board (MEQB), Nelson referred to the fact that the property is bordered on one side by a stream leading to several lakes and on another side by a wildlife pond and pool. In a December 14 communication to the MEQB, Nelson indicated that the U.S. Fish and Wildlife Service expressed concerns that $15,000 had been spent in that area to benefit the natural habitat and Nelson indicated the dog facility may have a huge impact through noise, pollution, and waste disposal or runoff.

On December 14, the district manager for the Morrison County Soil and Water Conservation District sent a letter to the MEQB indicating that a 600–dog structure would produce a sizable amount of animal waste. Consequently, the manager found it appropriate that soil tests and manure testing be required, as in situations in which an agricultural producer is expanding or applying for a new or expanded feedlot permit. She also indicated that there would be questions as to how long the adjoining fields could sustain the dog feces application, the environmental effects on the shallow water table over a prolonged period of time, and the setback from water features. On December 20, the MEQB determined that Morrison County was the appropriate governmental unit to decide whether to require an EAW for the proposed dog-breeding facility.

The Morrison County Planning Commission hearing at which the CUP application was addressed was held on December 19, 2005. At the meeting, McDuffee said he wanted a 600–dog cap for adult breeding dogs. He expected they would have about 500 puppies in the first year and more in years later. The 600 limit applies only to breeding dogs. No cap was proposed for the number of puppies and nonbreeding dogs in the CUP. McDuffee said that the dogs to be bred would be Cocker Spaniel size or smaller, averaging ten pounds.

Any adult dogs allowed outside would be debarked. Regarding dog waste, McDuffee said that he planned to rake it and stockpile it on a slab in the winter. In the spring, a neighbor would spread it on his fields following USDA guidelines.

Dr. Extrand, McDuffee's long-term veterinarian, stated that McDuffee's kennels had always been in compliance with USDA and state regulations. He testified that he has debarked about 10,000 dogs, in an operation in which the dogs' vocal cords are "removed" while they are under anesthesia. One of McDuffee's kennel employees said that McDuffee gives great love and care to the dogs.

The planning commission heard testimony in opposition to the CUP. A Belle Prairie Township supervisor opposed the request, citing major complaints that the township had received regarding an existing kennel. One neighbor expressed concerns and opposed the request. Relator Sarah Dickman, who lives across the road, expressed concerns regarding noise and odor. She added that she is with the Animal Humane Society, which has received many complaints about the Cushing kennel site, including reports of injured and sick animals and bad living conditions. Relator Roger Nelson, who lives about 100 feet away from the property line, testified that he was very concerned about the environmental effects.

The planning commission then addressed the seven criteria for the CUP, using a checklist, with eight members voting in favor of the CUP and one abstaining. The planning commission also imposed three conditions: that a privacy fence be installed on one side, that there be a cap of 600 adult breeding dogs, and that all dogs kept outside be debarked.

On January 10, 2006, the county board of commissioners held a meeting to consider the citizens' petition for an EAW and to

review the planning commission's recommendation that the CUP be granted. The board unanimously decided that an EAW was not needed for the proposed dog kennel. Later, the board considered the CUP for the dog kennel. McDuffee was in attendance and in response to questions explained that there would be no more than 600 adult breeding dogs, including male and female, and these would be debarked. He explained that puppies would not go outside. The board approved the CUP subject to the three conditions proposed by the planning commission.

After the CUP was issued to McDuffee and after the formal record was closed, a large volume of material, most of it in opposition to the issuance of the CUP, was sent to the county. The county board took note of that material and pursuant to that volume of criticism, the board directed the county administrator and the county attorney to write to McDuffee. In addition, relator Minnesota Federated Humane Societies (MFHS) sent a letter of concern and requested copies of staff reports, the application, and the permit, which were sent.

At the February 7, 2006 county board meeting, staff reviewed the process that was followed in approving the CUP. Staff reported on recent developments, including information that McDuffee had violated USDA license standards on the dog kennel that he previously owned. The county administrator indicated that while this information would have been very helpful, the public hearing phase of the process had been designed to receive this kind of information. He noted that the courts would examine the information that the board had at the time the decision was made, not afterwards. He pointed out

that the county could have some liability to McDuffee, who by then had purchased the property, if the county board attempted to reverse its decision on the CUP.

The administrator went on to explain that while previously kennels were treated in a similar manner as hog or chicken feedlots, all have since learned a great deal about commercial dog-breeding kennels. Some feel that dogs, which are companion animals, should be treated differently. One unidentified speaker stated he had received letters originating from all 50 states and overseas. The staff recommended that the board adopt a moratorium for one year on CUPs for commercial dog-breeding kennels. The board adopted that recommendation.

The county administrator and county attorney wrote a letter to McDuffee[2] on February 7, 2006, stating that since the earlier vote, the county board had learned that surgical debarking is overwhelmingly disfavored within the veterinary community and that many allege it is inhumane. Consequently, they encouraged the use of barking (shock) collars instead of surgical debarking. They then reminded McDuffee that he must maintain a USDA license and comply with all license requirements and warned that if he did not, the county board would reconsider the CUP.

The Nelson relators and MFHS bring a certiorari appeal from the board's decision to grant the CUP. The Nelson relators also challenge the February 7, 2006 letter. McDuffee moves to strike a portion of the Nelson relators' appendix and brief.

**ISSUES**

I. Does the Minnesota Federated Humane Societies have standing to bring its own certiorari appeal?

---

**2.** The letter, reproduced in full later in this opinion, states: "[W]e encourage the use of barking collars in place of surgical debarking. While we realize that this is ultimately your choice, not ours, we will not defend your use of the surgical practice to any or all inquirers."

II. Should respondent McDuffee's motion to strike portions of the Nelson relators' appendix and brief be granted?

III. Was the county board's decision to issue the conditional use permit arbitrary, capricious, or unreasonable?

IV. Did the February 7, 2006 county board letter to McDuffee constitute an amendment to the conditional use permit, which requires compliance with the procedures required for issuance of a new conditional use permit?

V. Did the county board act unreasonably, arbitrarily, or capriciously in refusing to grant a new hearing on the conditional use permit?

## ANALYSIS

### I.

■■■ We first address whether relator Minnesota Federated Humane Societies (MFHS), which filed a certiorari appeal and a brief as if it were a full party to this action, has standing to participate in this certiorari appeal. Although none of the parties raised the issue, standing is essential to a court's exercise of jurisdiction and may be raised on the court's own motion.[3] *Annandale Advocate v. City of Annandale*, 435 N.W.2d 24, 27 (Minn.1989). A party has standing if it suffers an injury in fact or if the legislature has conferred standing. *State by Humphrey v. Philip Morris Inc.*, 551 N.W.2d 490, 493 (Minn. 1996); *In re Pappas Senate Comm.*, 488 N.W.2d 795, 797 (Minn.1992). The entity seeking standing must have "a sufficient stake in a justiciable controversy to seek relief from a court," and the goal of this requirement "is to ensure that issues before the courts will be 'vigorously and adequately presented.'" *Humphrey*, 551 N.W.2d at 493 (citation omitted).

■■■ MFHS argues that its standing is conferred under certain provisions in the prevention-of-cruelty-to-animals statutes. Minn.Stat. 343.01–.40 (2004). MFHS exists through legislative enactment. Minn. Stat. 343.01, subd. 1. Its purpose is "to assist in the enforcement of the laws for the prevention of wrongs to animals; ... to aid [district and county humane] societies and agents in the enforcement of the laws for the prevention of wrongs to animals which may now or hereafter exist, and to promote the growth of education and sentiment favorable to the protection of animals." Minn.Stat. 343.06.

The conditional use permit (CUP) at issue in this case specifically authorizes respondent Gary McDuffee to keep up to 600 adult breeding dogs at his kennel, plus an unlimited number of puppies and non-breeding dogs, and it requires debarking of all dogs that have access to the outdoors. McDuffee's veterinarian testified at the planning committee meeting that debarking is a surgical procedure in which the dogs' vocal cords are removed. Relator Sarah Dickman indicated that another kennel operated by McDuffee had generated complaints concerning sick and injured animals and adverse living conditions for the animals. Further, the February 7, 2006 letter sent to McDuffee indicated that the county board realized that it had not had the benefit of documentation in opposition to the debarking procedure and belatedly made a statement opposing surgical debarking. In light of this information, it is apparent that issues of animal welfare must be addressed. MFHS, pursuant to its statutory purpose, is the party best equipped to provide the county board with relevant evidence on the debarking procedure and on animal cruelty concerns that

---

**3.** This court issued an order questioning jurisdiction as to MFHS and required the parties to submit informal memoranda addressing the standing issue.

will arise out by operation of a kennel containing up to 600 breeding dogs and an unlimited number of puppies and non-breeding dogs. Based on the prevention-of-cruelty-to-animals statute and the fact that MFHS will ensure that the issues of alleged animal cruelty will be thoroughly discussed, MFHS has standing to bring its own certiorari appeal.

## II.

We next address McDuffee's motion to strike a portion of the appendix and brief filed by relators Roger Nelson, et al. (the Nelson relators).

### A. EAW documents

McDuffee first moves to strike all documents contained in the Nelson relators' appendix that were considered by the board in deciding the need for an environmental assessment worksheet (EAW), as well as references to the EAW in their brief.

■ The county board considered the CUP application and the citizens' petition to require an EAW for the CUP at the same meeting, and documents relating to both are contained in the record relayed to this court for this certiorari appeal. Papers filed, exhibits, and transcripts are part of the record in a certiorari appeal. Minn. R. Civ.App. P. 110.01; see Minn. R. Civ.App. P. 115.04, subd. 1 (providing that generally, rules 110 and 111 apply to certiorari appeals). Therefore, these documents are part of the record.

McDuffee, however, argues that the Nelson relators are seeking review of the EAW decision in this proceeding. EAW decisions are reviewable through a declaratory judgment action in district court. Minn.Stat. 116D.04, subd. 10 (2004); Minn. R. 4410.0400, subp. 4 (2005). The Nelson relators advise that they are seeking review of the EAW decision in district court

and state they are not asking this court to review the EAW decision (at this time) in this certiorari appeal. Instead, the Nelson relators argue that the documents were relevant to environmental matters considered in the CUP determination. First, the board was to consider the "effect of the proposed use upon the health, safety, morals, and general welfare of occupants of surrounding land and water bodies." Morrison County, Minn., Ordinances 507.2(a). Further, one of the criteria for granting a CUP is whether the proposed use is "reasonably related to the existing land use and the environment." *Id.* 507.2(a)(4). McDuffee contends that to the extent the environmental issues in the petition for an EAW and the application for the CUP overlap, the EAW preempts the county ordinance. *See Blue Earth County Pork Producers, Inc. v. County of Blue Earth*, 558 N.W.2d 25, 27–29 (Minn.App.1997) (holding that state law did not preempt county from enacting feedlot ordinance), *review denied* (Minn. Mar. 26, 1997).

■ We decline to strike the documents relating to the EAW that are a part of the record. Finally, we decline to address a claim of preemption raised for the first time in a reply memorandum on a motion to strike and not addressed in the appeal on the merits. *See Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn.1988) (holding that reviewing court generally will consider only issues raised and presented to trial court); *see also Brink v. Smith Cos. Constr.*, 703 N.W.2d 871, 879 (Minn.App. 2005) (holding that issue appellant raised for first time on appeal in reply brief will generally not be considered), *review denied* (Minn. Dec. 21, 2005).

### B. Documents not in the record

Next, McDuffee contends that this court should strike a number of documents in

the Nelson relators' brief because they are not contained in the record below.

■ As discussed above, the record in a certiorari appeal consists of the papers filed, the exhibits, and transcripts. Minn. R. Civ.App. P. 110.01. "An appellate court may not base its decision on matters outside the record on appeal, and may not consider matters not produced and received in evidence below." *Thiele,* 425 N.W.2d at 582–83. "Typically, when a quasi-judicial body such as a county board denies a permit, the reviewing court 'should, of course, confine itself at all times to the facts and circumstances developed before that body.'" *In re Livingood,* 594 N.W.2d 889, 893 n. 3 (Minn.1999). An exception to this rule arises when uncontroverted documentary evidence of a conclusive nature supports the decision below, in which case the reviewing court has the discretion to consider such evidence. *Id.* at 895–96. But when evidence that is inconclusive on a disputed issue is offered to support reversal rather than affirmance, consideration of such evidence is never allowed. *Plowman v. Copeland, Buhl & Co.,* 261 N.W.2d 581, 584 (Minn.1977).

■ McDuffee moves to strike documents in the Nelson relators' appendix and portions of the brief addressing the documents that relate to another dog-breeding facility that he had operated with his ex-wife, but that are not in the record below. McDuffee also moves to strike an undated memo that he apparently authored, contained in relators' appendix and referred to in their brief, indicating the number of employees in his proposed facility. Relators do not address these arguments. We grant the motion to strike as to these documents and references that are not part of the record.

■ McDuffee next moves to strike articles copied from Internet sites that ad-dress environmental and health problems arising from contact with dog feces and information relating to debarking and shock collars that the Nelson relators include in their appendix and refer to in their brief, but that are not part of the record.

Relators contend that these documents are properly before this court for the first time on appeal because this court can take judicial notice of "the important public health information from reliable sources concerning the public health risk of pathogens present in dog urine and feces." Relators point out that the supreme court has taken judicial notice that the interests of public health require that barbers be aware that disease could spread through the uncleanliness of barbers. *State v. Zeno,* 79 Minn. 80, 84, 81 N.W. 748, 749 (1900) (upholding constitutionality of law requiring license for barber).

■ "An appellate court may take judicial notice of a fact for the first time on appeal." *Smisek v. Comm'r of Pub. Safety,* 400 N.W.2d 766, 768 (Minn.App.1987) (taking judicial notice of trial court order in related proceeding). "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Minn. R. Evid. 201(b) (applicable to civil cases). But while judicial or official notice may be taken of general matters of common knowledge, it cannot be constitutionally used as a substitute for adjudicating specific facts without a hearing. *In re Hibbing Taconite Co.,* 431 N.W.2d 885, 891–92 (Minn.App.1988) (addressing concept in agency proceedings).

The Nelson relators are asking more than that this court take judicial notice

generally of public health risks from animal waste. Instead, they are asking this court to consider many specific documents that were not before the county board, and use those documents to reverse the county board's decision on a disputed matter. That we will not do. *See Plowman,* 261 N.W.2d at 584.

Relators compare their information copied from the Internet to learned treatises, which may be "established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice" under Minn. R. Evid. 803(18) and are not hearsay in court proceedings. *See generally Sorensen v. Maski,* 361 N.W.2d 498, 500–01 (Minn.App. 1985) (upholding district court decision sustaining objection to cross-examination of expert using statements from an accident reconstructionist treatise, when the expert did not recognize the treatise as authoritative and when there was no attempt to establish reliability of the treatise through proponent's own expert witness). Even though some of the Internet sources the Nelson relators cite may be recognizable, no explanation has been provided as to how the sources cited obtained the information they put on the Internet and whether each "sponsors, endorses, collects, or simply provides the information on the web sites." *Fenner v. Suthers,* 194 F.Supp.2d 1146, 1149 (D.Colo.2002). Information from websites may be modified at will by webmasters or others, and there is no assurance that the cite to the website provided in the appendix is the same viewed by a visitor to the website today. *Id.* at 1148–49. We grant the motion to strike as to this material.

 Finally, McDuffee moves to strike the extensive correspondence, primarily consisting of e-mails from the public to the

county after the CUP decision was made. The Nelson relators contend that some of the correspondence was sent to the county before its February 7, 2006 meeting and letter and was considered by the county.[4] Very few of these documents appear in the record that was sent to this court. All counsel received notice of the contents of the record that was sent to this court. Had they felt it was incomplete, they could have moved to correct the omissions in the record pursuant to Minn. R. Civ.App. P. 110.05, but no such motion was made. On material not part of the record, McDuffee's motion to strike is granted.

### III.

 The challenges to the CUP on the merits will now be addressed. Quasi-judicial decisions by a county board regarding a CUP are reviewable by certiorari to this court. *Interstate Power Co. v. Nobles County Bd. of Commrs.,* 617 N.W.2d 566, 574 & n. 5 (Minn.2000); *Picha v. County of McLeod,* 634 N.W.2d 739, 741 (Minn.App.2001). The standard of review is a deferential one, as counties have wide latitude in making decisions about special use permits. *Schwardt v. County of Watonwan,* 656 N.W.2d 383, 386 (Minn.2003). Further, we give more deference to a decision approving a CUP than to a decision denying one. *Id.* at 389 n. 4. An appellate court will "review a county's decision to approve a CUP independently to see whether there was a reasonable basis for the decision, or whether the county acted unreasonably, arbitrarily, or capriciously." *Id.* at 386. For a challenge to a CUP to succeed, there must be a showing "that the proposal did not meet one of the standards set out in the Ordinance and that the grant

---

**4.** The Nelson relators' argument that the county board's letter of February 7 to McDuf-

fee constitutes a modification of the CUP will be addressed later in this opinion.

of the CUP was an abuse of discretion." *Id.* at 387 (footnote omitted).

An agency's decision is arbitrary or capricious if the agency relied on factors the legislature never intended it to consider, if it entirely failed to consider an important aspect of the problem, if it offered an explanation for the decision that runs counter to the evidence, or if the decision is so implausible that it could not be ascribed to a difference in view or the result of agency expertise.

*Pope County Mothers v. Minn. Pollution Control Agency,* 594 N.W.2d 233, 236 (Minn.App.1999).

Morrison County is authorized to carry out planning and zoning activities under Minn.Stat. 394.21, subd. 1 (2004). Boards may by ordinance designate certain kinds of development as "conditional uses" under zoning regulations. *Id.* 394.301, subd. 1 (2004). Conditional use is defined as

a land use ... as defined by ordinance that would not be appropriate generally but may be allowed with appropriate restrictions as provided by official controls upon a finding that (1) certain conditions as detailed in the zoning ordinance exist, and (2) the use ... conforms to the comprehensive land use plan of the county and (3) is compatible with the existing neighborhood.

*Id.* 394.22, subd. 7 (2004). "Conditional uses may be approved upon a showing by an applicant that standards and criteria stated in the ordinance will be satisfied." *Id.* 394.301, subd. 1. The board may require additional conditions. *Id.,* subd. 2 (2004).

The land at issue is zoned agricultural. A kennel is a permitted use on agricultural land but requires a CUP. Morrison County, Minn., Ordinances 801. A kennel is defined as: "Any structure or premises on which four (4) or more dogs are kept for sale, breeding, profit or similar uses." *Id.*

400. The ordinance sets out the criteria for granting a CUP and requires consideration of seven factors. *Id.* 507.2. Only three of those factors, as well as one condition, are at issue, and they will be addressed below.

### 1. Traffic problems

■ The Nelson relators first contend that the board erroneously determined that McDuffee met the requirement that the proposed use "will not create an excessive burden on existing parks, schools, *public roadways* and other public facilities and utilities which serve or are proposed to serve the area." Morrison County, Minn., Ordinance 507.2(a)(1) (emphasis added). With regard to this factor, McDuffee's application stated that with two to three full-time employees, there should not be an excess burden on the existing roads. The minutes of the meeting before the planning commission do not reveal any discussion about roads or traffic. The planning commission recommended finding that "the requested use will *not* create an unreasonably excessive burden on the existing roads or other utilities." The board adopted this finding.

The Nelson relators first contend that the board's decision was unreasonable, arbitrary, and capricious as to the finding on the burden on the road. They assert that if McDuffee followed the applicable state and federal laws for the care required for 600 breeding dogs and an unspecified number of puppies, a minimum of 50 employees would be required. They contend the board failed to consider the impact of these employees using the roadways and failed to make additional findings as to traffic, parking, or congestion.

Respondents contend that relators waived this issue because it was not raised below. Appellate courts will not address

issues or evidence raised for the first time on appeal. *Thiele,* 425 N.W.2d at 582–83; *Graham v. Itasca County Planning Comm'n,* 601 N.W.2d 461, 468 (Minn.App. 1999) (applying *Thiele* to issues raised for the first time on appeal of zoning decision). Relators contend that relator Sara Dickmann raised this issue when she testified as to her objections to the kennels based on her concerns regarding "noise and odor." Taking the record as a whole, we do not find an explicit challenge regarding traffic concerns.

 A decision-maker must make findings or other explanations of its decision that are adequate for judicial review. *Sunrise Lake Ass'n, Inc. v. Chisago County Bd. of Comm'rs,* 633 N.W.2d 59, 61 (Minn.App.2001). A board's use of a checklist may be "a sufficient expression of the board's conclusions that the conditions for approval have been met." *Schwardt,* 656 N.W.2d at 389. Findings as to adverse traffic problems caused by a proposed use must be supported by independent analysis or facts in the record. *Yang v. County of Carver,* 660 N.W.2d 828, 835 (Minn.App.2003) (reversing denial of CUP in part because no basis in record for board determination that excessive traffic would be created by proposed use).

Here, McDuffee explained his proposed number of employees and expressed his belief that those few employees would not create a burden on existing roads. Relators' argument is based on speculation, and that cannot support a determination that the board's finding was unreasonable, arbitrary, or capricious.

*2. Noise*

 The Nelson relators next contend that the board made arbitrary and capricious findings regarding noise and failed to consider the noise that would be created if McDuffee did not use debarking or shock collars on the outside dogs. Under the general provisions relating to a CUP, the board must consider the effect of the proposed use on the "health, safety, morals and general welfare of the occupants of surrounding lands and water bodies." Morrison County, Minn., Ordinance 507.2(a). One of the findings that must be made is that "[e]xisting occupants of nearby structures will not be adversely affected because of curtailment of customer trade brought about by *intrusion of noise,* odor, glare or general unsightliness." *Id.* 507.2(a)(7) (emphasis added).

In McDuffee's initial application for the CUP, he stated as to this factor that all adult dogs will be debarked to alleviate noise. At the hearing, a veterinarian who had provided veterinary services for McDuffee for some 24 years, Charles Extrand, testified that he has debarked perhaps 10,000 dogs. He explained that by removing dogs' vocal cords using a surgical process while the dogs are under anesthesia, they will no longer make high-pitched barks, although they can still make noise and communicate. As discussed earlier, relator Sara Dickmann testified about her concern about the noise. In opposition, one of McDuffee's former neighbors wrote that the noise level was nominal when McDuffee owned a nearby kennel. Another wrote that the "short term barking at feeding time certainly was no more disruptive to our lives than were 'hot-rodding' vehicle drivers, snowmobilers, and/or four-wheelers."

Based on this evidence, the planning commission recommended the following finding, which the board adopted: "The requested use will *not* create an unreasonably adverse effect because of noise, odor, glare or general unsightliness for near-by property owners." This is supported by the record.

Then, the board adopted the following condition as well: "All dogs which have access to the outside *be debarked.*" (Emphasis added). It is this imperative condition that causes concern.

MFHS argues that where the governing body has not taken a "hard look" at the problems involved, this court should not defer to its decision. *See Citizens Advocating Responsible Dev. v. Kandiyohi County Bd. of Comm'rs,* 713 N.W.2d 817, 838 (Minn.2006) (reversing and remanding where there was insufficient evidence in the record to show that county took a "hard look" at one of the required criteria). MFHS properly asserts that the board's decision is arbitrary and subject to reversal where, as here, a governing body failed to consider an important aspect of the problem. Minn. Ctr. for Envtl. *Advocacy v. City of St. Paul Park,* 711 N.W.2d 526, 534 (Minn.App.2006). The MFHS contends that the board's cursory analysis was not a "hard look" because it failed to take into account Minnesota policy and statutes concerning cruel and inhumane treatment towards animals and it failed to consider the ramifications of its decision to impose the condition of debarking on outside dogs. *See generally* Minn.Stat. 343.01–.40.

We agree and, thus, remand. Proof of lack of information on this issue is contained in the February 7, 2006 letter that the county administrator and county attorney sent to McDuffee. The letter stated: "First, we are writing to clarify the county's interpretation of one of the conditions placed on [the] recently issued Conditional Use Permit. . . ." The county board indicated that it had learned *since the CUP was issued that,* "surgical debarking is overwhelmingly disfavored within the veterinary community and many allege that it is inhumane. It is also a permanent and irreversible approach to the problem of noise."

McDuffee claims caselaw supports his argument that severing a dog's vocal cords is not permanent. Our answer is, McDuffee will be entitled to produce evidence on this point on remand.

### 3. Environment

The final challenge by relators to the January 10 decision concerns the fourth criterion for granting a CUP, that the use, in the opinion of the planning commission, "is reasonably related to the existing land use and the environment." Morrison County, Minn., Ordinance 507.2(a)(4). These issues relate to McDuffee's proposal that the dog waste be spread on his property and that of a neighboring property. McDuffee contends that this is relevant only to the petition for an EAW, which was denied by the county board and which is subject to review in a declaratory judgment action in district court, and not to the CUP. *See* Minn.Stat. 116D.04, subd. 10 (providing for review of EAW decisions in district court).

While it is clear that this court does not have jurisdiction, at this point, to address the challenge to the EAW, one criterion to consider in granting a CUP is whether the use is reasonably related to the existing land use and the environment.

The county addresses this issue in detail. The county explains that discussion was held at the meetings regarding the manure practices that would be utilized. This consisted of stockpiling the manure during the winter months and applying the manure on nearby agricultural fields during the summer, making the requested use reasonably related to the existing land use and the environment.

We do not base our decision solely on environmental factors, which are the focus of the EAW litigation. Nonetheless, the potential environmental effects of the facil-

ity cannot be ignored, and are in the record. A letter by the district manager of the Morrison Soil and Water Conservation District to the environmental quality board (regarding the CUP application) stated:

A 600 dog structure will produce a sizable amount of animal waste as well. The proposed site has a small approximately 10 acre field, and there is a type 3 wetland on one side, and a county ditch on the other. The soils mapping on the field indicates the presence of Isan and Meehan soils, both wetter soils, with poor drainage and rapid permeability.

It does seem appropriate that soils tests and manure testing would be required similar to livestock situations. The question of how long the field can sustain dog feces application and what the environmental effects on the shallow water table might be over a prolonged period of time seems valid. Also, the setback from the water features should be addressed.

This office does not have the expertise to answer those questions but surely the information is available from some source and should be applied to this permit request. With livestock operations, the burden of showing an environmentally safe operation is placed on the applicant.

## IV.

 Next, we address the Nelson relators' argument that the letter of February 7, 2006, to McDuffee constituted a sua sponte modification of the CUP that violated county ordinances and was arbitrary, capricious, and unreasonable.

The county board argues that the record closed on January 10, 2007, and that material received afterward is not part of the record and should be stricken. Pursuant to the county's motion, some of the materials have been stricken. However, the fact that materials critical of the board's decision were later received is part of the record, and the county board opened the door to our review because, *after the record closed, the county specifically took note of later received* materials, and relied on them in formulating the February 7, 2006 letter. Pursuant to the county board's direction, the county administrator and the county attorney wrote the following February 7, 2006 letter to McDuffee. The letter reads:

First, we are writing to clarify the county's interpretation of one of the conditions placed on your most recently issued Conditional Use Permit regarding "debarking" the dogs. As you have previously mentioned, the number of dogs that this would apply to is low. Consistent with our previous understanding, we have indicated that it is only a concern for those that have outside access. We want to take this opportunity to further clarify that we believe this permit condition can best be met with the use of barking collars instead of surgical debarking. A barking collar is a collar that delivers a mild shock whenever the dog barks to condition it to bark less. We have learned that surgical debarking is overwhelmingly disfavored within the veterinary community and many allege that it is inhumane. It is also a permanent and irreversible approach to the problem of noise. As such, we encourage the use of barking collars in place of surgical debarking. While we realize that this is ultimately your choice, not ours, we will not defend your use of the surgical practice to any or all inquirers.

Second, in light of recent disclosures concerning citations at the Happy Trails kennel by USDA Inspectors during the time period that you were running it with your ex-wife, Wanda, we feel com-

pelled to remind you that at your new location you also must maintain a USDA license and be in compliance with your license requirements at all times. Should Morrison County at any time be made aware that that is not the case, we will request that the County Board reconsider your Conditional Use Permit through the normal public process.

The Nelson relators contend that that February 7, 2006 letter from the county to McDuffee improperly altered the CUP without compliance with the procedures needed for amending a CUP. Under Morrison County, Minn., Ordinances 507.7, certain changes require an amended CUP, which can be obtained only by following all of the procedures required for a new CUP application. These changes include

structural alterations, enlargement, intensification of use, or similar change not specifically permitted by the conditional use permit issued, shall require an amended conditional use permit and all procedures and a new permit fee shall apply as if a new permit were being issued including information on the use, location and conditions imposed by the Planning Commission, time limits, review dates, and such other information as may be appropriate.

*Id.*

This February 7 letter is definitive. It shows the county board realized (pursuant to after-acquired materials) that it did not have the benefit of thorough research and documentation when they first discussed the "debarking" issue. In view of that late-arriving information, we conclude the county "informally amended the CUP" and made a statement against debarking. Rather than reverse and remand on the narrow point of procedurally amending a CUP, we recognize the inherent authority of an agency to reconsider a decision. *In re Class A License Application of North Metro Harness, Inc.,* 711 N.W.2d 129, 136 (Minn.App.2006), review denied (Minn. June 20, 2006). The fairest result is to remand this matter to the county board to give the board a chance to reconsider the issuance of a CUP. On remand, the board is instructed to allow all parties herein the opportunity to present their evidence.

**V.**

Finally, relators contend that the board should have allowed a hearing on the new evidence. Because of our decision, this issue is moot. A new hearing will be required on remand.

**DECISION**

The decision of the county board to include a limited debarking condition, based on the scarcity of information provided before January 10, 2006, was arbitrary and capricious.

The alteration of the CUP, based on the consideration of late-arriving information on debarking, did not follow the correct procedure for issuance of an amended CUP.

MFHS is a full party to this action and is entitled to notice of all future proceedings.

We reverse and remand to the Morrison County Board for reconsideration of the application for the conditional use permit.

**Reversed and remanded; motion granted in part and denied in part.**