In the Matter of Whether There is a Need for an ENVIRONMENTAL IMPACT STATEMENT (EIS) Regarding the David Nisbit Quarry Conditional Use Permit Application to Extract Industrial Sand,

Pauline Connaughty, et al., Relators,

v.

Winona County Board of Commissioners, Respondent,

David Nisbit, Respondent,

Sherry Nisbit, Respondent,

Tom Rowekamp, Respondent.

Nos. A13–0745, A13–1198.

Court of Appeals of Minnesota.

June 16, 2014.

James P. Peters, Law Offices of James P. Peters, PLLC, Glenwood, MN, for relators.

Jay T. Squires, Elizabeth J. Vieira, Rupp, Anderson, Squires & Waldspurger, P.A., Minneapolis, MN, for respondent Winona County Board of Commissioners.

Tom Rowekamp, Stewartville, MN, pro se respondent.

David and Sherry Nisbit, Utica, MN, pro se respondents.

Considered and decided by PETERSON, Presiding Judge; SCHELLHAS, Judge; and CONNOLLY, Judge.

## OPINION

CONNOLLY, Judge.

Relators challenge the Winona County Board of Commissioners' decisions to issue

a negative declaration on the need for an environmental impact statement and a conditional-use permit for a proposed silica sand mining project. Relators argue that (1) the negative declaration was based on an error of law because the county did not consider the cumulative potential effects of the project, (2) the negative declaration is not supported by substantial evidence in the record, and (3) the conditional-use permit was based on inadequate environmental review. We affirm.

### FACTS

Relators are residents of Winona County who are concerned about the potential environmental effects of a proposed silica sand mining project located in the county. Respondents are the Winona County Board of Commissioners (the county board), which is both the responsible governmental unit (RGU) charged with conducting the environmental review and the permitting authority for the conditional-use permit (CUP) at issue; David and Sherry Nisbit, who own the land where the project will be located; and Tom Rowekamp, who is the CEO of IT Sands LLC and the Nisbits' mining partner.

In 2011, David and Sherry Nisbit submitted an application to the county board for a CUP for their proposed silica sand mining project. The Nisbit Mine Project (the project) is proposed on 19.1 acres of the Nisbits' land in Winona County. The primary purpose of the project is to remove silica sand for export purposes. The silica sand will be mined and then sold to the Brannt Valley load-out and sand-washing facility in Winona. From there, it will be shipped out of state to be used as a proppant for hydraulic fracturing of hydrocarbon wells.[1] The project does not address final sand washing or processing, rail loading, or interstate transport, because these processes will take place at existing facilities in Winona. The project is expected to last for approximately two to three years, after which the site will be returned to grassland.

In December 2011, the county board imposed a moratorium on CUP applications to fully study the potential environmental effects of silica sand mining. On May 1, 2012, Winona County lifted the moratorium; the Nisbits resubmitted their CUP application on July 20.

On August 16, the Winona County Planning Commission (the planning commission) held a public hearing on the Nisbits' CUP application. At the hearing, the planning commission heard nine public comments and reviewed 35 conditions that the planning department recommended for the project. After reviewing the proposed conditions, the planning commission added two conditions to the permit. With these 37 conditions in place, the planning commission voted 6–3 to recommend approval of the project to the county board.

After the planning commission's vote, the county board, acting as the RGU, prepared an environmental assessment worksheet (EAW) for the project. On January 15, 2013, the county board submitted the EAW to the Environmental Quality Board (EQB). Following a 30–day public-comment period, the planning commission held a public hearing concerning the need for an environmental impact statement (EIS)

1. "Hydraulic fracturing, also called fracking or hydrofracking, is a method used to access oil bearing shales and limestones and extracting oil and natural gas. Fracking requires a proppant, which are particles that hold open fractures in the shale that allow the oil or gas to be collected." Envtl. Quality Bd., *Report on Silica Sand* 1 (2013), *available at* http://www.eqb.state.mn.us/documents/23.% 20March% 20Final% 20Silica% 20Sand% 20report.pdf.

for the project. The planning commission reviewed 13 public comments and 54 written comments. On March 21, it recommended that the county board issue a negative declaration on the need for an EIS.

On April 2, the county board held a meeting and concluded that an EIS was not required for the project. On June 4, the county board held a meeting to discuss the CUP for the project. The county board added two more conditions and granted the CUP, requiring the Nisbits to comply with 39 conditions.

On April 29, relators filed a petition for a writ of certiorari to challenge the negative declaration for an EIS. On July 1, relators filed a petition for a writ of certiorari to challenge the county's grant of the CUP for the project. This court granted relators' motion to consolidate.

## ISSUES

I. Did the county board err by making a negative declaration on the need for an EIS because it was not reasonable, did not comply with applicable law, or was not supported by substantial evidence?

II. Did the county board abuse its discretion by granting a CUP for the project?

## ANALYSIS

### I.

Relators first argue that the county board's negative declaration on the need for an EIS for the project was based on an error of law and not supported by substantial evidence in the record. We disagree.

"A person aggrieved by a final decision on ... the need for an environmental impact statement ... is entitled to judicial review of the decision...." Minn.Stat. § 116D.04, subd. 10 (2012). An EAW is "a brief document which is designed to set out the basic facts necessary to determine whether an environmental impact statement is required for a proposed action." Minn.Stat. § 116D.04, subd. 1a(c) (2012). The RGU is required to make either a negative or a positive declaration on the need for an EIS based on "information gathered during the EAW process and the comments received on the EAW." Minn. R. 4410.1700, subp. 3 (2013).

"An EIS shall be ordered for projects that have the potential for significant environmental effects." Minn. R. 4410.1700, subp. 1 (2013); *see also* Minn.Stat. § 116D.04, subd. 2a (2012) ("Where there is potential for significant environmental effects resulting from any major governmental action, the action shall be preceded by a detailed [EIS] prepared by the [RGU]."). In determining whether a project has the potential for significant environmental effects, the RGU considers the following factors: (1) "type, extent, and reversibility of environmental effects"; (2) "cumulative potential effects of related or anticipated future projects"; (3) "the extent to which the environmental effects are subject to mitigation by ongoing public regulatory authority"; and (4) "the extent to which environmental effects can be anticipated and controlled as a result of other available environmental studies undertaken by public agencies or the project proposer, including other EISs." Minn. R. 4410.1700, subp. 7 (2013).

A relator has the burden of proving that the RGU's findings are unsupported by the evidence as a whole. *Citizens Advocating Responsible Dev. v. Kandiyohi Cnty. Bd. of Comm'rs (CARD)*, 713 N.W.2d 817, 833 (Minn.2006). We evaluate "whether the RGU took a hard look at the salient issues, but defer to the RGU's decision unless the decision reflects an error of law, is arbitrary and capricious, or is unsupported by substantial evidence."

*Friends of Twin Lakes v. City of Roseville,* 764 N.W.2d 378, 381 (Minn.App.2009) (quotation omitted). "Substantial evidence consists of: (1) such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; (2) more than a scintilla of evidence; (3) more than 'some evidence'; (4) more than 'any evidence'; and (5) evidence considered in its entirety." *CARD,* 713 N.W.2d at 832 (quotation omitted). An agency's decision is arbitrary and capricious if the agency

> (a) relied on factors the legislature never intended it to consider, (b) entirely failed to consider an important aspect of the problem, (c) offered an explanation for the decision that runs counter to the evidence, or (d) rendered a decision so implausible that it could not be ascribed to a difference in view or the result of agency expertise.

*Watab Twp. Citizen Alliance v. Benton Cnty. Bd. of Comm'rs,* 728 N.W.2d 82, 89 (Minn.App.2007), *review denied* (Minn. May 15, 2007).

## A. Type, extent, and reversibility of potential environmental effects

Relators do not argue that the county board failed to consider the type, extent, and reversibility of potential environmental effects from the project. The county board stated that it looked to the EAW, written comments, responses to written comments, and public hearing testimony in considering the type, extent, and reversibility of any potential environmental effects and concluded that the project would not have significant environmental effects due to its small size and the positive effect the reclamation period would have on the environment. The record indicates that the mine is a relatively small project located on a 19.1 acre site. The project will last for approximately two to three years. After the project discontinues its mining operation, the area will be reclaimed and restored to grassland. We conclude that the county board, acting as the RGU, properly considered the type, extent, and reversibility of potential environmental effects before making a negative declaration on the need for an EIS for the project.

## B. Cumulative potential effects

Relators argue that the county board "erred in issuing the negative declaration based upon an error of law and without substantial evidence regarding cumulative error," and that it arbitrarily and capriciously concluded that the project was "small, isolated, and experimental so that the EAW did not need any cumulative potential effects analysis."

The definition of cumulative potential effects is as follows:

> [T]he effect on the environment that results from the incremental effects of a project in addition to other projects in the environmentally relevant area that might reasonably be expected to affect the same environmental resources, *including future projects actually planned or for which a basis of expectation has been laid,* regardless of what person undertakes the other projects or what jurisdictions have authority over the projects. Significant cumulative potential effects can result from individually minor projects taking place over a period of time.

Minn. R. 4410.0200, subp. 11a (2013) (emphasis added). To determine whether the cumulative potential effects of a proposed project result in a significant environmental effect, the RGU must consider: (1) whether the cumulative potential effect is significant, (2) whether the contribution from the project is significant when viewed in connection with other contributions to the cumulative potential effect, (3) the de-

gree to which the project complies with approved mitigation measures specifically designed to address the cumulative potential effect, and (4) the efforts of the proposer to minimize the contributions from the project. Minn. R. 4410.1700, subp. 7. We conclude that substantial evidence in the record shows that the county board considered each factor before determining that "there are no anticipated cumulative potential effects for this mine project."

### 1. Whether the potential effect is significant

In determining whether the potential cumulative effects of a proposed project result in significant environmental effects, the RGU must consider whether the potential environmental effect is significant. Minn. R. 4410.1700, subp. 7. The county board concluded:

> [T]he Nisbit sand mine is a small and isolated 19.1 acre site, not associated with any other silica sand mining and/or processing projects that have been proposed and considered by the Board in the past.
>
> . . . .
>
> However, the potential cumulative effect of the Nisbit sand mine project is limited in scope to 19.1 acres and limited in the duration of its operation to 3 years.

In reaching its conclusion that the cumulative potential effect of the project is not significant, the county board examined numerous data sources, including the EAW, the written comment record, and letters from various environmental organizations. The record indicates that the project submitted the first application for this type of industrial sand mining in Winona County. The proposed mine site is a 19.1 acre parcel located in the middle of 74.09 acres of agricultural land, which is significantly smaller than other proposed projects. The project is expected to last for approximate-

ly two to three years, after which the site will be returned to grassland. The county board properly considered this factor and substantial evidence in the record supports its finding that the potential cumulative effect of this small and limited-duration project is minimal.

### 2. Whether the contribution from the project is significant when viewed in connection with other contributions

The RGU must consider whether the contribution from the project is significant when viewed in connection with other contributions in determining whether the cumulative potential effects of a proposed project causes significant environmental effects. Minn. R. 4410.1700, subp. 7. The inquiry into the cumulative potential effects of a proposed project, which may not individually have the potential to cause significant environmental effects, could have a significant effect when considered along with other projects that (1) are already in existence or planned for the future; (2) are located in the surrounding area; and (3) might reasonably be expected to affect the same natural resources. *CARD*, 713 N.W.2d at 831. This type of geographically limited inquiry serves the purpose of alerting the governing body to any potential significant environmental effects of a proposed project before the governing body takes action to approve or disapprove the project. *Id.*

> In determining if a basis of expectation has been laid for a project, an RGU must determine whether a project is reasonably likely to occur and, if so, whether sufficiently detailed information is available about the project to contribute to the understanding of cumulative potential effects. In making these determinations, the RGU must consider: whether any applications for permits

have been filed with any units of government; whether detailed plans and specifications have been prepared for the project; whether future development is indicated by adopted comprehensive plans or zoning or other ordinances; whether future development is indicated by historic or forecasted trends; and any other factors determined to be relevant by the RGU.

Minn. R. 4410.0200, subp. 11a.

■ The county board considered this factor and found:

The only other silica sand mining projects that were actually filed for consideration of [CUP] applications before the Board were the Yoder and Dabelstein sand mining sites ... which are now the subject of an EIS for which the EQB is the RGU. When those sites could be in actual operation, if at all, is purely speculative at this point given the lengthy time the EIS will require.... A silica sand processing plant proposed to be located near the city of St. Charles in Winona County has never been formally filed for review before any governmental body in Winona County and its future development is purely speculation.

. . . .

The Board recognizes that the extent to which [the cumulative potential effects] occur will be largely dependent upon the ultimate extent of the industry in the geographic region.

The record supports these findings. The EAW identifies the cumulative potential effects of the proposed project and states:

[T]here are currently six active silica sand washing and/or load out facilities actively operating in Winona; these facilities purchase silica sand from approved and active mines located in Wisconsin....

It is possible that other mining projects are proposed within Winona County but the exact location, plans and details are unknown and cannot be reliably predicted due to proprietary economics and permitting.

Even though relators cite several comments about the need for more information than that provided in the EAW to fully assess the cumulative potential effects of the project, the record does not support relators' assertion that any potential projects were "reasonably likely to occur" or "that might reasonably be expected to affect the same environmental resources." *See* Minn. R. 4410.0200, subp. 11a. When no known future projects are anticipated, any effects they may have are speculative, and any consideration of their potential effects is equally speculative. *White v. Minn. Dep't of Natural Res.*, 567 N.W.2d 724, 732 (Minn.App.1997).

Relators have not specifically identified any projects that they believe should have been included in the county board's cumulative-potential-effects analysis. The county board identified the Yoder and Dabelstein sand mining projects as "other mine owners and operators not affiliated with the Nisbit mine [that] are discussing projects within the vicinity of this project." Both sites are currently undergoing environmental review and are currently in the EIS process. Additionally the record indicates that a 300–acre project has been proposed in Winona County, and a 50–acre site has been proposed in Fillmore County, neither of which has undergone environmental review. There are also three "pre-applicants" in Fillmore County.

We have no facts to conclude that these projects are other than speculative. These sites are at various stages of planning, but the record does not indicate when these operations are reasonably likely to occur. None of these proposed projects have re-

ceived the requisite permit to operate a mining operation; they are in various stages of environmental review and subject to financial viability. Although the Yoder and Dabelstein sites are currently subject to environmental review, it is still speculative when these sites will be in operation due to the amount of time and the cost of environmental review. The cost of preparing and distributing an EIS is imposed on the proposer of the action. Minn.Stat. § 116D.045, subd. 3 (2012). "[P]reparation and distribution of an EIS is neither swift nor inexpensive." *CARD*, 713 N.W.2d at 839 (Anderson, G. Barry, J., concurring).

Relators also comment that "other projects in the area were sufficiently definite that Fillmore County requested an EIS," and "Houston County did the same." Relator has not shown that these projects are "other projects in the environmentally relevant area that might reasonably be expected to affect the same environmental resources." Minn. R. 4410.0200, subp. 11a. In fact, the Fillmore and Houston County projects do not acknowledge the Nisbit project when discussing geographically relevant silica mining operations.

We conclude that the county board considered the cumulative potential effect of the project in relation to projects that (1) are already in existence or planned for the future, (2) are located in the surrounding area, (3) might reasonably be expected to affect the same natural resources. The record shows that any future mining projects in the relevant geographic area are speculative because they have not yet gone through the permitting process or are uncertain due to the length of time and the financial resources needed to complete environmental review.

### 3.  Mitigation measures

In considering the cumulative potential effects of a proposed project, the RGU also must consider the degree to which the project complies with approved mitigation measures specifically designed to address the cumulative potential effect of the project. Minn. R. 4410.1700, subp. 7. The county board stated that "it will have the ability to react to new information as it becomes available through the permitting authority." Moreover, it noted that the use of CUPs, which would be subject to review by the county board, would mitigate cumulative potential effects of future mine projects in the relevant geographic area.

Substantial evidence in the record supports these findings. Prospective projects must apply to Winona County for a CUP to operate a mine. Winona County, Minn., Zoning Ordinance (WCZO) § 9.10. Among other requirements, the applicant must provide a mine plan, performance standard, and reclamation plan as well as a traffic-impact analysis and proof of authority to operate the project. *Id.* Before issuing the CUP, the county board determines whether environmental review in the form of an EAW or EIS is required, which would include a cumulative-potential-effects analysis. Based on this analysis, the county board can add conditions to the applicant's permit to mitigate these potential effects.

The county board reviewed the Nisbits' CUP application and imposed 39 conditions to mitigate the environmental effects of the project; it considered this factor and determined that the project does not have anticipated cumulative potential effects. We conclude that this determination is supported by substantial evidence in the record.

### 4.  *The efforts of the proposer to minimize the contributions from the project*

In considering the cumulative potential effects of a proposed project, the RGU

must consider the efforts of the proposer to minimize the contributions from the project. The county board found that "the Nisbit sand mine applicant has been responsible with their plans to mitigate impact." As a part of their CUP application, the Nisbits described the performance standard and the reclamation plan for the project, which are designed to minimize the contribution of the project on the environment. Moreover, the project must abide by the 39 conditions set forth in the CUP. Therefore, the county board properly considered this factor in analyzing the cumulative potential effects of the project.

We conclude that the county board properly considered: (1) whether the cumulative potential effect is significant, (2) whether the contribution from the project is significant when viewed in connection with other contributions to the cumulative potential effect, (3) the degree to which the project complies with approved mitigation measures specifically designed to address the cumulative potential effect, and (4) the efforts of the proposer to minimize the contributions from the project, before determining that the project has no anticipated cumulative potential effects that result in significant environmental effects. *See* Minn. R. 4410.1700, subp. 7. Moreover, its finding that the project has no anticipated cumulative effects is supported by substantial evidence in the record. Consequently, relators have not met their burden of showing that the county board erred by determining that the project has no anticipated cumulative effects that cause significant environmental effects requiring an EIS.

## C. Mitigation

Relators next argue that "the court should reverse the negative declaration because substantial evidence failed to support respondent county's conclusions re-

garding the potential for environmental effects of the project." We disagree.

■ In determining whether a project has the potential for significant environmental effects, an RGU must consider "the extent to which the environmental effects are subject to mitigation by ongoing public regulatory authority." Minn. R. 4410.1700, subp. 7C. "When an RGU considers mitigation measures as offsetting the potential for significant environmental effects under Minn. R. 4410.1700, it may reasonably do so only if those measures are specific, targeted, and are certain to be able to mitigate the environmental effects." *CARD*, 713 N.W.2d at 835. "[A]n RGU may not rest its EIS determination decision on mitigation that amounts to only vague statements of good intentions." *Id.* at 834 (quotations and citation omitted). Pre-existing regulatory oversight is a proper means of preventing significant environmental effects before they occur. *Friends of Twin Lakes,* 764 N.W.2d at 382.

### 1. Traffic

■ Relators first contend that substantial evidence demonstrates that the project has the potential to cause significant environmental effects because increased traffic will cause increases in noise, dust, emissions, and health effects for residents living along the route of the project.

The project will generate a *maximum* of 280 truck trips per day (140 trips each way). The record shows that there are several measures in place to mitigate the resulting environmental effects. In considering whether the project has the potential for causing significant environmental effects, the county board reviewed a traffic-impact analysis attached to the EAW. The EAW considered the traffic-impact analysis and stated that "the impact on [c]ounty [h]ighways is being miti-

gated by proposed requirements for a road impact agreement." After reviewing the traffic-impact analysis, the Minnesota Department of Transportation found that the EAW provided all of the information necessary for it to form an opinion about the need for further environmental review and stated "the EAW for the Nisbit Mine [is] acceptable."

The record also indicates that the environmental effects resulting from the increased traffic will be mitigated by the CUP. There are 11 conditions in the CUP dealing with traffic concerns. Significantly, the owners/applicants must obtain access permits from the county where mine traffic enters or exits the county highway and the quarry operation cannot exceed 140 loaded trucks per day. Any amendment to traffic levels requires additional review. The owner/applicant is also responsible for entering into a road use agreement with the township for any use of local township roads and is responsible for maintenance and repair of damage resulting from the mining operation.

In response to comments about possible noise pollution resulting from the mine traffic, the county noted that the project is required to adhere to the Winona Zoning Code and the Minnesota Noise Rules set forth in Minn. R. 7030. Moreover, with regard to vehicle diesel emissions, the project must adhere to federal occupational health requirements. Equipment and vehicles used for the project must comply with all federal air emissions and fuel use standards. We conclude that these pre-existing regulatory oversights are proper means of preventing significant environmental effects before they occur.

### 2. Air quality

■ Relators next argue that "[t]he [record of decision] establishes that the Project has the potential for significant environmental effects on air quality due to crystalline silica dust generated by the operations." We disagree.

The record indicates that "[t]he Minnesota Department of Health has cautioned on the health risks associated with silica dust but has acknowledged that no data is available on the levels of respirable silica generated by frac sand mining or processing and that no data is available for ambient air conditions having possible lower concentrations of silica dust." But the county board considered the project's potential for causing significant environmental effects on air quality and implemented measures to mitigate these effects. The CUP requires air-quality monitoring in areas where there are residential homes within 1,320 feet of the proposed project site. In these areas, the owner/applicant is responsible for the costs of air-quality monitoring by a professional selected by the county. Additionally, the county has a maximum allowable air quality standard for 3ug/m3 levels. If these levels are exceeded, the mine must cease and take precautions to minimize airborne particulate. These are specific measures implemented to mitigate any significant effect on air quality. *See CARD*, 713 N.W.2d at 835.

### 3. Water use for dust emissions

■ Relators argue that the county's negative declaration on the need for an EIS for the project is not supported by substantial evidence in the record because the proposed source of water for the project has not been disclosed and the project creates an increased risk of sinkholes. In response to a comment about water usage concerns, the county stated:

> Water used for dust control will be hauled in tanker trucks after having been purchased from an existing permitted public water supply. The project does not propose use of water from wells

on the property. It will not require connection or changes to any public water supply or appropriations of any ground or surface water. The proposer has not yet indicated which existing permitted public water supply the water will be purchased from, however, existing state law regulates water appropriations if needs exceed established thresholds.

The county board concluded that any potential water-use issues would be addressed by DNR water-appropriation permit processes. We conclude that this permit process is a sufficient means of preventing and mitigating significant environmental effects. *Friends of Twin Lakes,* 764 N.W.2d at 382.

Further, in response to seven comments about sinkhole creation, the county noted:

Survey shows the site is within an area of ... low to moderate probability for karst features.... This classification is defined as an area that has only widely scattered individual sinkholes or isolated clusters of 2 to 3 sinkholes where the average sinkhole density is less than one sinkhole per square mile. No karst features, sinkholes or caves are known to exist on the site and there are no mapped sinkholes within approximately 1.3 miles of the property....

According to the applicant, the upper 70–80 feet of the St. Peter Sandstone is not prone to sinkhole formation and sinkhole formation can most easily be avoided by preventing the concentration of water in ponds.

Thus, the record supports the finding that the potential significant environmental effect of sinkholes resulting from the project will be mitigated by preventing the concentration of water ponds on the Nisbits' property.

Although the project may have some effects on the environment, we conclude that there is substantial evidence in the record to show that the county identified specific and targeted measures that will mitigate these environmental effects. *See CARD,* 713 N.W.2d at 835.

### D. The extent to which environmental effects can be anticipated and controlled as a result of other available environmental studies

Relators do not argue that the county board failed to consider the extent to which environmental effects can be anticipated and controlled as a result of other available environmental studies. The commissioner found that the county board will have the ability to react to new information through its permitting authority and issuance of CUPs. As previously noted, the Winona County Zoning Ordinances set forth detailed requirements that all project applicants must meet before the county board decides whether to issue a CUP.

Because substantial evidence in the record supports the county board's conclusion that the project will not result in significant environmental effects, we conclude that it did not err in making its negative declaration on the need for an EIS for the project.

### II.

Relators next argue that the CUP for the project was improperly issued because it was based on inadequate environmental review. We disagree. By statute, counties may approve conditional uses if the applicant satisfies the standards set out in the applicable county ordinance. Minn.Stat. § 394.301, subd. 1 (2012). "An appellate court will review a county's decision to approve a CUP independently to see whether there was a reasonable basis for the decision, or whether the county acted unreasonably, arbitrarily, or capri-

ciously." *In re Block*, 727 N.W.2d 166, 177 (Minn.App.2007) (quotation omitted). "[W]e give more deference to a decision approving a CUP than to a decision denying one." *Id.*

## A. Procedure

Relators argue that "the court should vacate the CUP as premature because respondent county failed to require the project to complete an EIS." Their argument is based on their claim that "because the EAW process was flawed and [the negative EIS declaration] should be reversed with an order for an EIS, the Court of Appeals should also vacate the [CUP] as prematurely issued so that any final decisions on the CUP should be made upon a complete environmental review process." We disagree.

Under Minn.Stat. § 116D.04, subd. 2b (2012):

> If an environmental assessment worksheet or an environmental impact statement is required for a governmental action under subdivision 2a, a project may not be started and a final governmental decision may not be made to grant a permit, approve a project, or begin a project, until:
>
> (1) a petition for an environmental assessment worksheet is dismissed;
>
> (2) a negative declaration has been issued on the need for an environmental impact statement;
>
> (3) the environmental impact statement has been determined adequate; or
>
> (4) a variance has been granted from making an environmental impact statement by the environmental quality board.

In this case, an EAW was completed under Minn. R. 4410.1000, .1100. After completing the EAW, the RGU published it for the requisite 30–day comment period. Af-

ter reviewing the record and the comments submitted, the RGU made a negative EIS declaration for the project on April 2, 2013. On June 4, the county board made the final governmental decision to grant the CUP.

■ Based on the above analysis, the county board's negative EIS declaration is supported by substantial evidence in the record and the county properly considered any cumulative potential effects of the project. Because the negative EIS declaration was issued before the final governmental decision to grant the CUP, we conclude that the CUP was not granted prematurely. *See* Minn.Stat. § 116D.04, subd. 2b.

## B. CUP issuance

■ Relators next argue that "the court should vacate the CUP because substantial evidence on important aspects is lacking to support the issuance of the CUP to respondents." We disagree.

The applicable ordinance in this case is WCZO § 5.5.4.1. Under this section, the requirements for issuing a CUP are as follows:

> 1. The use will not create an excessive burden on existing parks, schools, streets/roads and other public facilities and utilities which serve or are proposed to serve the area.
>
> 2. The use will be sufficiently compatible or separated by distance or screening from adjacent land so that existing properties will not be depreciated in value and there will be no deterrence to development of vacant land.
>
> 3. The structure and site shall have an appearance that will not have an adverse effect upon adjacent residential properties.

4. The use is reasonably related to the overall needs of the County and to the existing land use.

5. The use is consistent with the purpose of the Zoning Ordinance and the purposes of the zoning district in which the applicant intends to locate the proposed use.

6. The use is in conformance with the Comprehensive Plan of the County.

7. The use will not cause traffic hazard or congestion.

WCZO § 5.5.4.1. "When a use permit is approved, the decision-making body is always implicitly giving the same reason—all requirements for the issuance of the permit have been met." *Corwine v. Cnty. of Crow Wing*, 309 Minn. 345, 352, 244 N.W.2d 482, 486 (1976), *overruled on other grounds by Nw. College v. City of Arden Hills*, 281 N.W.2d 865 (Minn.1979). Relators have not alleged that the county board failed to consider any of these factors.

Even so, the record indicates that the CUP application met the criteria for granting a CUP. There is nothing in the record that indicates that the use will create an excessive burden on existing parks, schools, streets, roads, or other public facilities and utilities. In fact, according to the CUP, the owner/applicant is responsible for some road-maintenance costs including but not limited to cracking, ride quality, shoulder maintenance, and replacement costs based on pavement rating at the start of the mining operation. Next, the land use for the project will be compatible and separated from adjacent properties. The proposed project site is a 19.1 acre parcel located in the middle of 74.09 acres of agricultural land, which abuts row crop agriculture on all sides. There are no plans in the project proposal for any permanent structures, but temporary perimeter ring berms, ring ditches, and sediment basins will be constructed with on-site materials.

Moreover, the project is reasonably related to the overall needs of the county. The primary purpose of the project is to remove silica sand for export purposes. The majority of the coarse sand removed from the site will be exported from the area for use in various industries. The fine sand will be used locally, mainly as dairy sand and fill. The mined sand is subject to taxes, which will provide a benefit for the state, county, and township. The county's comprehensive plan promotes the protection and preservation of agricultural lands by limiting nonagricultural development. According to the county, mining natural resources, such as silica sand, in small-scale mining operations is historically attributable to agricultural areas.

Lastly, the project will most likely cause increased traffic based on the maximum of 280 vehicle trips to and from the site per day. But, as previously stated, the project will not cause traffic hazard or congestion based on the traffic impact analysis and the 11 traffic conditions in the CUP. We are aware that the issues involved in this case stir the passions of many people, but our role is limited to faithfully applying the law in reaching our decision, whether or not that decision is popular. Because we conclude that the CUP application complied with the applicable county ordinance, we must affirm.

### DECISION

Because we conclude that substantial evidence in the record supports the county board's conclusion that the project will not have significant environmental effects and because there was a reasonable basis for the issuance of the CUP, we affirm.

**Affirmed.**